672 A.2d 1132

STANLEY WEISS, JEROME E. SHARFMAN AND THOMAS J. LENNON, PLAINTIFFS-RESPONDENTS, v. CARPENTER, BENNETT & MORRISSEY, EDWARD F. RYAN AND MICHAEL S. WATERS, DEFENDANTS-APPELLANTS, AND JOHN DOE-1 THROUGH JOHN DOE-10, PARTNERS OF CARPENTER, BENNETT & MORRISSEY, DEFENDANTS.

CARPENTER, BENNETT & MORRISSEY, EDWARD F. RYAN AND MICHAEL S. WATERS, PLAINTIFFS-APPELLANTS, v. STANLEY WEISS, JEROME E. SHARFMAN, AND THOMAS J. LENNON, DEFENDANTS-RESPONDENTS.

Argued September 27, 1995—Decided March 6, 1996.

*Jerome J. Graham, Jr.* argued the cause for appellants (*Ribis, Graham & Curtin,* attorneys; *George C. Jones,* on the briefs).

*Stanley Weiss* argued the cause *pro se.*

*Jerome E. Sharfman* argued the cause *pro se* and for respondent Thomas J. Lennon.

The opinion of the Court was delivered by

STEIN, J.

In *Jacob v. Norris, McLaughlin & Marcus,* 128 *N.J.* 10, 607 *A.*2d 142 (1992), we held that a law firm's "Service Termination Agreement" that withheld termination compensation only from those firm members who within one year of termination represented clients of the firm or solicited employees of the firm to engage in law practice violated *Rule* 5.6 of the Rules of Professional Conduct (*RPCS* ). *Id.* at 22, 607 *A.*2d 142. At issue in this appeal is the enforceability of a provision in a law firm's partnership agreement that withholds the right to receive distribution of a partner's capital account only from partners who withdraw from the firm for any reason other than death, permanent disability, attainment of age sixty-five, or appointment to the judiciary.

Pursuant to the partnership agreement, the claims of three withdrawing partners that the agreement's effect contravened our holding in *Jacob, supra,* were referred to an arbitrator selected by the parties, who determined that the challenged provisions violated *RPC* 5.6. Relying on *Jacob,* 128 *N.J.* at 36, 607 *A.*2d 142, the arbitrator further determined that one of the withdrawing partners was equitably estopped from challenging the enforceability of the invalid provisions because of his influential role as a member of the firm's Executive Committee and his acquiescence in the firm's enforcement of those provisions against partners who previously had withdrawn from the firm.

In a reported opinion, the Appellate Division affirmed the arbitrator's decision to the extent that it held invalid under *Jacob* the provisions restricting capital-account distributions to certain withdrawing partners. *Weiss v. Carpenter, Bennett & Morrissey,* 275 *N.J.Super.* 393, 404, 646 *A.*2d 473 (1994). Invoking a public-policy exception to the general rule of noninterference with arbitration awards, *see Tretina Printing, Inc. v. Fitzpatrick & Assocs., Inc.,* 135 *N.J.* 349, 358, 640 *A.*2d 788 (1994), the Appellate Division concluded that the arbitrator's application of estoppel principles to the claim of one of the withdrawing partners would violate *RPC* 5.6, and therefore vacated the judgment of the Chancery Division confirming the award. *Weiss, supra,* 275 *N.J.Super.* at 408–09, 646 *A.*2d 473. We granted the law firm's petition for certification, 142 *N.J.* 446, 663 *A.*2d 1354 (1995). Accordingly, we must address the extent to which arbitration awards implicating the validity under *RPC* 5.6 of law firm agreement termination provisions are subject to enhanced judicial scrutiny because of their public-policy implications.

I

We base our summary of the material facts primarily on the arbitrator's factual determinations, supplemented as required by other portions of the record.

Procedurally, this appeal is the outgrowth of consolidated civil actions. Stanley Weiss (Weiss), Jerome E. Sharfman (Sharfman), and Thomas J. Lennon (Lennon), former partners of the New Jersey law firm of Carpenter, Bennett & Morrissey (CB & M), instituted the first action as a result of disagreements concerning the amounts to which they were entitled as withdrawing partners of the firm. They sued CB & M to recover their claimed shares of the firm's capital and earnings, and to recover damages for alleged breaches of fiduciary duties and other tortious conduct. On CB & M's motion, all claims, except for a defamation claim asserted by Weiss, were referred to arbitration. The parties designated the Honorable Sidney Schreiber, a former Associate Justice of this Court, to serve as arbitrator. Following hearings on the liability issues, the arbitrator issued a comprehensive opinion holding unenforceable under *RPC* 5.6 the provision of the CB & M partnership agreement that required Weiss, Sharfman, and Lennon to forfeit their equity interests in the firm because they had withdrawn as partners prior to age sixty-five for reasons other than death, disability, or judicial appointment. The arbitrator determined that Sharfman and Lennon should receive their equity interests in the firm, that Weiss was equitably estopped from contesting the forfeiture provision, and that each of the withdrawing partners should receive his share of CB & M's 1991 net income, but not the additional share of net income to which he would have been entitled on withdrawal at age sixty-five or for death disability, or judicial appointment. The arbitrator issued his award after the parties stipulated the amounts to which the withdrawing partners were entitled.

CB & M then instituted a summary proceeding to confirm the award, and the withdrawing partners counterclaimed to vacate portions of the award and confirm the balance. The trial court confirmed the award in all respects, consolidating for purposes of appeal the initial action that had been stayed with the summary proceeding instituted to confirm the award.

The disagreement between CB & M and its withdrawing partners concerned provisions of the partnership agreement specifying the payments to which partners leaving the firm would be entitled. CB & M, a well-established Newark law firm, had adopted the practice of revising its partnership agreement every three years since 1970; on execution, the revised agreement would take effect retroactively on the date following the termination of the prior agreement. Weiss, Sharfman, and Lennon, as well as the other partners, had signed the partnership agreement in question, which took effect January 1, 1988, and which by its terms contemplated that the partnership would enter into a successor agreement during 1991. The 1988 agreement provided that the percentage interests allocated to the partners would continue in effect until December 31, 1990, and that between that date and the execution of the successor agreement the compensation of all partners would be determined by a majority vote of the senior partners.

Weiss, a senior partner and a member of CB & M's Executive Committee, joined the firm in 1959 and became a junior partner in 1963. Weiss headed one of CB & M's nine working groups; Sharfman and Lennon were junior partners and members of the working group headed by Weiss.

Weiss's withdrawal from the firm was triggered by the negotiations leading to the adoption of a partnership agreement that would replace the 1988 agreement. Weiss submitted a proposed outline of an agreement that apparently contemplated increased compensation and voting rights for Weiss and two other Executive Committee members, which the Executive Committee approved by a divided vote. The senior partners, however, rejected Weiss's proposal and adopted an alternative proposal that was substantially consistent with the 1988 agreement. Primarily because of the partners' vote on the terms of the successor agreement, Weiss decided in May 1991 to leave CB & M. Later that month, Sharfman and Lennon determined that they would join Weiss in forming a new law firm. The three withdrawing partners left CB & M on June 30, 1991.

After their departure, Weiss, Sharfman, and Lennon sought payment of the amounts allegedly due under the 1988 partnership agreement. The pertinent provisions are Paragraphs 9 and 10. Paragraph 9 applies only "in the event of the retirement of any partner from the firm by reason of becoming totally and permanently disabled, or to accept a judicial appointment, or after attaining his or her sixty-fifth (65th) birthday, or in the event of the death of any partner." Pursuant to Paragraph 9, if a partner's withdrawal occurs for any one of the specified reasons, the firm will pay to the retiring partner (or his or her estate): (1) the partner's pro-rata share of the firm's net income in the year of retirement calculated on the basis of the portion of the year that the partner worked, plus 25% of that amount (but not exceeding 100% of the partner's share of the full year's income); (2) the amount of the partner's interest in CB & M's building fund; and (3) a specified sum, constituting the amount of the partner's capital account in the firm, calculated under Paragraph 9(f) by adding to the sum initially credited to the account on admission to partnership an annual amount equal to the partner's capital contributions for the purchase of fixed assets and the partner's share of CB & M's repayment of its loan from First Fidelity Bank.

CB & M contended that the rights of the withdrawing partners were controlled by Paragraph 10(a), which provided:

> 10. (a) In the event of the termination or withdrawal of any partner for any reason other than provided in Paragraph 9 hereof, his or her interest in the firm property of every nature, including good will, shall terminate and be forfeited, except as otherwise expressly provided in subparagraph (b) of this Paragraph 10, and his or her distributable share of firm income shall be limited to a percentage of the net income to which he or she would be otherwise entitled with respect to the calendar year of such withdrawal, such percentage to be computed in the ratio that his or her completed months worked in such year as a partner shall bear to twelve (12) months.

Paragraph 10(b) provided that all withdrawing partners were entitled to recover their interest in CB & M's Building Fund, which reflected amounts advanced by the partners from 1983 to 1985 to finance CB & M's relocation to new offices. Accordingly, CB & M asserted that the three retired partners were entitled to

receive only the value of their building fund accounts plus their pro-rata shares of the firm's 1991 net income. The former partners contended that the forfeiture provisions were inapplicable or, if applicable, were violative of *RPC* 5.6 as interpreted by this Court in *Jacob, supra,* 128 *N.J.* 10, 607 *A.*2d 142.

CB & M also contended that even if the forfeiture provisions of Paragraph 10(a) were invalid, Weiss was estopped from contesting their validity because of his role, as a senior partner of CB & M, in causing the forfeiture provisions to be retained in the partnership agreement and in enforcing those provisions against other withdrawing partners of the firm. Concerning the estoppel question, the arbitrator noted that the CB & M partnership agreements since at least 1963, the year in which Weiss became a junior partner,

> contained the same general format with respect to partners who left the firm. In one category were those who retired because of disability or age. This was later enlarged to include those who left to accept a judicial appointment. The second category consisted of all others who left the firm for any other reason. Those in the first group received a percentage of income of the calendar year in which they departed and a sum of money for their interest in accounts receivable, library, furniture, etc. The second group received only their percentage of income.

The arbitrator also noted that in 1984, Weiss "became a member of the Executive Committee which governed the firm and initially prepared the partnership agreement every three years. It was the Executive Committee which framed and modified the agreements over the years."

The arbitrator relied specifically on Weiss's participation, on behalf of CB & M, in litigation involving a partner's divorce proceeding as demonstrating Weiss's understanding and endorsement of the forfeiture provisions of the partnership agreement. Weiss had represented CB & M on a motion to quash a subpoena duces tecum to produce the firm's partnership agreement in a divorce proceeding involving Robert Turtz, a junior partner, in which Turtz's interest in the firm was relevant on the issue of equitable distribution. In that proceeding, Weiss resisted production of the CB & M partnership agreement and argued, relying on a certification of partner Thomas L. Morrissey:

I should say as to that that Mr. Turtz' interest is not a vested interest in anything there. What the agreement shows is in the event he leaves the firm tomorrow, either on his preference or the preference of the senior partners of the firm, all he would have is what he earned for working this year.

The arbitrator observed that "Weiss' expressed position in the Turtz divorce proceeding evidences a belief that the clauses in question vested nothing in a partner." Weiss contends that his statements in the Turtz divorce matter focused instead on the provisions of the CB & M partnership agreement that authorized senior partners to terminate the partnership status of a junior partner "at any time, and for any reason."

Neither Sharfman nor Lennon appealed from the Chancery Division's confirmation of the arbitrator's award. Weiss appealed, contending in part that if issues concerning the interpretation of the Rules of Professional Conduct are to be arbitrable, courts must provide an enhanced review of the arbitrator's determinations. In addition, Weiss contended that the arbitrator's determination that he was equitably estopped from challenging the invalid forfeiture provisions of the agreement was inconsistent with our holding in *Jacob, supra.* CB & M cross-appealed, contending that the trial court erred in confirming the arbitrator's determination that Paragraph 10 violated the Rules of Professional Conduct, but pressing that contention only if the court were to hold that Weiss was not estopped from challenging the forfeiture provisions.

The Appellate Division determined that the issues concerning the interpretation and enforceability of the partnership agreement were properly referred to arbitration, and observed that " 'arbitration is a favored remedy' " even in cases involving issues affected by public policy. 275 *N.J.Super.* at 400, 646 *A.*2d 473 (quoting *Faherty v. Faherty,* 97 *N.J.* 99, 105, 477 *A.*2d 1257 (1984)). The court also concluded that some but not all of the issues referred to arbitration—specifically, the enforceability of the forfeiture provision in the CB & M agreement, and whether Weiss was equitably estopped from challenging it—involved significant public-policy issues that required a heightened standard of judicial review of the arbitrator's findings, consistent with this Court's observations

in *Tretina, supra,* 135 *N.J.* at 364–65, 640 *A.*2d 788. Applying an enhanced level of judicial review, the Appellate Division agreed with the arbitrator's conclusion that the forfeiture provisions of the CB & M agreement violated *RPC* 5.6, *id.* at 404–06, 646 *A.*2d 473, but determined that the evidence adduced did not justify the arbitrator's conclusion that Weiss should be equitably estopped from challenging those forfeiture provisions based on this Court's reference to estoppel principles in *Jacob, supra,* 128 *N.J.* at 36, 607 *A.*2d 142.

In its Petition, CB & M seeks review of the Appellate Division's determination that the forfeiture provision of the CB & M agreement violates *RPC* 5.6, and review of the Appellate Division's holding that enhanced judicial scrutiny of the arbitrator's estoppel ruling was appropriate and required reversal.

## II

### A

We first consider the appropriate standard of judicial review of private-sector arbitration awards that directly or indirectly affect significant public policy issues, because resolution of that question will affect our disposition of the remaining issues before us. The basic principle governing review of private-sector arbitration awards is that established in *Tretina, supra,* 135 *N.J.* at 358, 640 *A.*2d 788, in which a majority of this Court adopted the standard that had been advocated by the Chief Justice concurring in *Perini Corp. v. Greate Bay Hotel & Casino, Inc.,* 129 *N.J.* 479, 548, 610 *A.*2d 364 (1992):

> Basically, arbitration awards may be vacated only for fraud, corruption, or similar wrongdoing on the part of the arbitrators. [They] can be corrected or modified only for very specifically defined mistakes as set forth in [*N.J.S.A.* 2A:24–9]. If the arbitrators decide a matter not even submitted to them, that matter can be excluded from the award.

However, the Court emphasized in *Tretina* that heightened judicial scrutiny may be required for certain arbitration awards that sufficiently implicate public policy concerns:

Finally, and but distantly related to the foregoing discussion, we add our recognition that in rare circumstances a court may vacate an arbitration award for public-policy reasons. For example, in *Faherty v. Faherty*, 97 *N.J.* 99 [477 *A.*2d 1257] (1984), we held that "whenever the validity of an arbitration award affecting child support is questioned on the grounds that it does not provide adequate protection for the child, the trial court should conduct a special review of the award." *Id.* at 109 [477 *A.*2d 1257]. That heightened judicial scrutiny is required because of the courts' traditional role as *parens patria.* *Id.* at 111 [477 *A.*2d 1257]. Similarly, in a public-sector arbitration setting, a court can properly vacate an award because of a mistake of law. *Communications Workers v. Monmouth County Bd. of Social Servs.*, 96 *N.J.* 442 [476 *A.*2d 777] (1984). That exception is necessary because public policy demands that a public-sector arbitrator, who must consider the effect of a decision on the public interest and welfare, issue a decision in accordance with the law. *Kearny PBA Local # 21 v. Town of Kearny*, 81 *N.J.* 208, 217 [405 *A.*2d 393] (1979).

[135 *N.J.* at 364–65, 640 *A.*2d 788.]

The Court in *Tretina* relied only on *Faherty v. Faherty*, 97 *N.J.* 99, 477 *A.*2d 1257 (1984), to illustrate that enhanced judicial review may be essential for private-sector arbitration awards that significantly affect the public interest, but the circumstances that will require more than the customarily deferential review of arbitration awards remain largely undefined. In *Faherty*, the Chancery Division, in accordance with a provision in the parties' property-settlement agreement, ordered the divorced husband and wife to arbitrate issues of arrearages in alimony and child support as well as the question of modification of future alimony and child-support payments. The arbitrator's award determined the amount of arrearages in alimony and child support, and denied the husband's claim that the amount of future alimony and child-support payments should be reduced. On appeal, this Court rejected the husband's contention that the arbitration of alimony and child-support issues was contrary to public policy. We acknowledged, however, that the courts retain a nondelegable, supervisory function in respect of child support that requires a *de novo* review of arbitration awards concerning child support "unless it is clear on the face of the award that [it] could not adversely affect the substantial best interests of the child." *Id.* at 109–10, 477 *A.*2d 1257. We declined to resolve the question whether agreements to arbitrate issues of child custody and visitation were enforceable,

although we acknowledged that the policy considerations supporting enforcement of child support arbitration agreements "may be equally applicable to child custody and visitation cases." *Id.* at 110, 477 *A.*2d 1257.

We also suggested in *Tretina, supra,* 135 *N.J.* at 364–65, 640 *A.*2d 788, that heightened judicial review may be appropriate in respect of public-sector arbitration awards because of the public-sector arbitrator's obligation to consider the public interest and welfare, as well as the prevailing law, in rendering any award. Thus, in *Communications Workers of America, Local 1087 v. Monmouth County Board of Social Services,* 96 *N.J.* 442, 476 *A.*2d 777 (1984), this Court reversed an arbitration award granting back pay to a number of civil service employees whose names improperly had been removed from a promotion list, the award authorizing retroactive back pay for the period between the removal of their names from the list and their eventual promotions. Concluding that the arbitrator's award of back pay exceeded the authority conferred on the arbitrator by the negotiated agreement, *id.* at 451–52, 476 *A.*2d 777, and may have violated pertinent Civil Service statutes and regulations, *id.* at 453–55, we vacated the award and noted that public-sector arbitration awards are subject to more restrictive standards than awards rendered in private-sector arbitration:

> Furthermore, although parties in the private sector may explicitly authorize the arbitrator to decide legal issues as he deems fit irrespective of the governing law, this freedom is not available in the public sector. The parties in a public employment case cannot clothe the arbitrator with unbridled discretion, "for public policy demands that inherent in the arbitrator's guidelines are the public interest, welfare and other pertinent statutory criteria."
>
> [*Id.* at 450–51, 476 *A.*2d 777 (quoting *Kearny PBA, supra,* 81 *N.J.* at 217, 405 *A.*2d 393).]

*See also New Jersey State Policemen's Benevolent Ass'n, Local 29 v. Town of Irvington,* 80 *N.J.* 271, 288–93, 403 *A.*2d 473 (1979) (holding that in "final offer" arbitration to determine amount of pay increase for town's police officers arbitrator was obligated to take into account local government Cap Law, as well as public interest and welfare, in arriving at award); *City of Atlantic City v.*

*Laezza,* 80 *N.J.* 255, 268–69, 403 *A.*2d 465 (1979) (same); *Division 540, Amalgamated Transit Union v. Mercer County Improvement Auth.,* 76 *N.J.* 245, 252, 386 *A.*2d 1290 (1978) (noting that public-sector arbitrator "must consider the public interest and the impact of his decision on the public welfare").

Neither agreements to arbitrate child-support payment obligations, see *Faherty, supra,* 97 *N.J.* 99, 477 *A.*2d 1257, nor public-sector collective-bargaining arbitration agreements, see *Town of Irvington, supra,* 80 *N.J.* at 288–93, 403 *A.*2d 473, provide a sufficiently close analogy to the private-sector law-firm arbitration agreement before us to suggest precisely the extent to which public policy concerns should militate against the traditional rule of deference to arbitration awards. A court's nondelegable *parens patriae* responsibility to protect the best interests of children, *Faherty, supra,* 97 *N.J.* at 108, 477 *A.*2d 1257, differentiates the judicial function in reviewing child-support arbitration awards from a court's review function in respect of the award at issue here. Moreover, in public-sector arbitration agreements, the validity of an arbitrator's award necessarily must be measured against the overriding principle that "negotiated agreement with respect to matters beyond the lawful authority of the public employer is impermissible." *State v. State Supervisory Employees Ass'n,* 78 *N.J.* 54, 79, 393 *A.*2d 233 (1978).

We find constructive an examination of the evolving federal jurisprudence that addresses the circumstances under which federal courts are authorized to set aside collective-bargaining-agreement arbitration awards that are inconsistent with a clear mandate of public policy. The basic principle, established thirty years ago in the so-called *Steelworkers Trilogy, United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 *U.S.* 593, 80 *S.Ct.* 1358, 4 *L.Ed.*2d 1424 (1960), *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 *U.S.* 574, 80 *S.Ct.* 1347, 4 *L.Ed.*2d 1409 (1960), and *United Steelworkers v. American Mfg. Co.,* 363 *U.S.* 564, 80 *S.Ct.* 1343, 4 *L.Ed.*2d 1403 (1960), is that "[t]he federal policy of settling labor disputes by arbitration would be undermined if

courts had the final say on the merits of the awards." *Enterprise Wheel, supra,* 363 *U.S.* at 596, 80 *S.Ct.* at 1360, 4 *L.Ed.*2d at 1427. Accordingly, the Supreme Court observed that

> the question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his.
>
> [*Id.* at 599, 80 *S.Ct.* at 1362, 4 *L.Ed.*2d at 1429.]

The development of a public-policy qualification to the enforcement of collective-bargaining arbitration awards can be traced to *Hurd v. Hodge,* 334 *U.S.* 24, 68 *S.Ct.* 847, 92 *L.Ed.* 1187 (1948), where the Court observed that "[t]he power of the federal courts to enforce the terms of private agreements is at all times exercised subject to the restrictions and limitations of the public policy of the United States as manifested in the Constitution, treaties, federal statutes, and applicable legal precedents." *Id.* at 34–35, 68 *S.Ct.* at 853, 92 *L.Ed.* at 1195. The Court first addressed the public-policy qualification in an arbitration-award context in *W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum & Plastic Workers,* 461 *U.S.* 757, 103 *S.Ct.* 2177, 76 *L.Ed.*2d 298 (1983). In *Grace,* the defendant-employer had entered into a voluntary conciliation agreement with the Equal Employment Opportunity Commission (EEOC), but the conciliation agreement conflicted with the seniority provisions of Grace's collective-bargaining agreement. *Id.* at 759–60, 103 *S.Ct.* at 2179–80, 76 *L.Ed.*2d at 302–03. The company subsequently laid off employees in accordance with the conciliation agreement, some of whom, who would have been protected under the seniority provisions of the collective-bargaining agreement, filed grievances. Grace instituted suit, naming the Union and the EEOC as defendants, seeking an injunction against the arbitration of grievances intended to obtain relief inconsistent with the conciliation agreement. The District Court granted summary judgment for Grace and the EEOC, holding that the seniority provisions of the collective-bargaining agreement could be modified by the conciliation agreement to address the effects of past discrimination. *South-*

*bridge Plastics Div., W.R. Grace & Co. v. Local 759, Int'l Union of the United Rubber, Cork, Linoleum & Plastic Workers,* 403 *F.Supp.* 1183, 1188 (N.D.Miss.1975). While the Union's appeal was pending, Grace laid off more employees pursuant to the conciliation agreement, and additional grievances were filed. 461 *U.S.* at 760–62, 103 *S.Ct.* at 2180–81, 76 *L.Ed.*2d at 303–04. The Fifth Circuit Court of Appeals reversed, 565 *F.*2d 913 (5th Cir. 1978), holding that because Grace's seniority system was not motivated by a discriminatory objective, it could not be modified without the Union's consent. *Id.* at 916–17. That court granted the Union's counterclaim to compel arbitration of the filed grievances.

Although a first arbitrator dismissed the grievances filed by some discharged employees, a second arbitrator, presented with grievances by employees who had been laid off both before and after the initial District Court order, upheld the grievances, concluding that Grace's good-faith compliance with the conciliation agreement did not excuse its violations of the collective-bargaining agreement. Grace then instituted suit to vacate the award, contending that its enforcement was contrary to public policy. 461 *U.S.* at 762–64, 103 *S.Ct.* at 2181–82, 76 *L.Ed.*2d at 304–05. In upholding the second arbitrator's award, the Supreme Court acknowledged that it would not enforce the arbitrator's interpretation of the collective-bargaining agreement if to do so would violate an explicit public policy:

> As with any contract, however, a court may not enforce a collective-bargaining agreement that is contrary to public policy. See *Hurd v. Hodge,* 334 *U.S.* 24, 34–35, 92 *L.Ed.* 1187, 68 *S.Ct.* 847 [852–53] (1948). Barrett's view of his own jurisdiction precluded his consideration of this question, and, in any event, the question of public policy is ultimately one for resolution by the courts. See *International Brotherhood of Teamsters v. Washington Employers, Inc.,* 557 *F.*2d 1345, 1350 (CA9 1977); *Local 453 v. Otis Elevator Co.,* 314 *F.*2d 25, 29 (CA2), *cert. denied,* 373 *U.S.* 949, 10 *L.Ed.*2d 705, 83 *S.Ct.* 1680 (1963); Kaden, *Judges and Arbitrators: Observations on the Scope of Judicial Review,* 80 *Colum.L.Rev.* 267, 287 (1980). If the contract as interpreted by Barrett violates some explicit public policy, we are obliged to refrain from enforcing it. *Hurd v. Hodge,* 334 *U.S.,* at 35, 92 *L.Ed.* 1187, 68 *S.Ct.* 847 [at 853]. Such a public policy, however, must be well defined and dominant, and is to be ascertained "by reference to the laws and legal

precedents and not from general considerations of supposed public interests." *Muschany v. United States,* 324 *U.S.* 49, 66, 89 *L.Ed.* 744, 65 *S.Ct.* 442, 451 (1945).

[*Id.* at 766, 103 *S.Ct.* at 2183, 76 *L.Ed.*2d at 307.]

Nevertheless, the Court concluded that Grace's implementation of layoffs in a manner consistent with the initial District Court order did not afford Grace protection on public-policy grounds from the arbitrator's determination that the layoffs violated the collective-bargaining agreement:

Given the Company's desire to reduce its work force, it is undeniable that the Company was faced with a dilemma: it could follow the conciliation agreement as mandated by the District Court and risk liability under the collective bargaining agreement, or it could follow the bargaining agreement and risk both a contempt citation and Title VII liability. The dilemma, however, was of the Company's own making. The Company committed itself voluntarily to two conflicting contractual obligations.... In effect, [the arbitrator] interpreted the collective bargaining agreement to allocate to the Company the losses caused by the Company's decision to follow the District Court order that proved to be erroneous.

    \*       \*       \*       \*       \*       \*       \*       \*

By entering into the conflicting conciliation agreement, by seeking a court order to excuse it from performing the collective-bargaining agreement, and by subsequently acting on its mistaken interpretation of its contractual obligations, the Company attempted to shift the loss to its male employees, who shared no responsibility for the sex discrimination. The Company voluntarily assumed its obligations under the collective-bargaining agreement and the arbitrator's interpretations of it. No public policy is violated by holding the Company to those obligations, which bar the Company's attempted reallocation of the burden.

[*Id.* at 767, 770, 103 *S.Ct.* at 2184–86, 76 *L.Ed.*2d at 307–10.]

Four years after its decision on *W.R. Grace, supra,* the Supreme Court revisited the public-policy exception to collective-bargaining arbitration awards in *United Paperworkers International Union v. Misco, Inc.,* 484 *U.S.* 29, 108 *S.Ct.* 364, 98 *L.Ed.*2d 286 (1987), involving an arbitration award reinstating a machine operator who had been fired for possessing marijuana on plant premises. A police search of employee Cooper's home had uncovered a substantial quantity of marijuana, and continued police surveillance of Cooper led to his apprehension by police in the back seat of a car parked in the company lot during working hours with a lighted marijuana cigarette in the front-seat ash tray. Although unknown to company officials until after Cooper's dis-

charge, the police also found tracings of marijuana and a plastic scales case in Cooper's car, which also was then parked in the company lot. Cooper informed the company of his arrest for possessing marijuana in his home, but was discharged only for his apprehension in a car parked on company premises that contained a lighted marijuana cigarette, in violation of a posted company rule listing as cause for discharge the consumption of "intoxicants, narcotics or controlled substances in the plant, or on plant premises." *Id.* at 32–33 & n. 2, 108 *S.Ct.* at 368 & n. 2, 98 *L.Ed.*2d at 295–96 & n. 2. The arbitrator ordered Cooper reinstated with back pay, concluding that his presence in the back seat of a car that contained a lighted marijuana cigarette in the front ash tray did not establish that Cooper had used or possessed marijuana on company property, and rejecting evidence of the presence of marijuana in Cooper's car on the basis that the Company did not rely on that information as a ground for discharge. *Id.* at 34, 108 *S.Ct.* at 368–69, 98 *L.Ed.*2d at 296. The District Court vacated the award as contrary to public policy. A divided Fifth Circuit Court of Appeals affirmed, concluding that reinstatement would violate the public policy "against the operation of dangerous machinery by persons under the influence of drugs or alcohol." 768 *F.*2d 739, 743 (5th Cir.1985).

Noting that "the Courts of Appeals are divided on the question of when courts may set aside arbitration awards as contravening public policy," 484 *U.S.* at 35, 108 *S.Ct.* at 369, 98 *L.Ed.*2d at 297, the Supreme Court reinstated the arbitrator's award, observing initially that neither the arbitrator's factual finding that the company had failed to prove use or possession of marijuana on company premises, nor the arbitrator's refusal to consider evidence that Cooper's car had contained marijuana because the company had been unaware of that fact when it fired him, constituted a legally sufficient basis for the lower court's refusal to confirm the award. *Id.* at 39–42, 108 *S.Ct.* at 371–73, 98 *L.Ed.*2d at 299–301. Addressing the Court of Appeals' holding that the award violated a public policy against operation of machinery by persons under the influence of drugs, the Court attempted to limit

the scope of the public-policy exception to the general rule of deference to collective-bargaining arbitration awards:

> A court's refusal to enforce an arbitrator's award under a collective-bargaining agreement because it is contrary to public policy is a specific application of the more general doctrine, rooted in the common law, that a court may refuse to enforce contracts that violate law or public policy. *W.R. Grace & Co. v. Rubber Workers,* 461 *U.S.* 757, 766, 76 *L.Ed.*2d 298, 103 *S.Ct.* 2177 (1983); *Hurd v. Hodge,* 334 *U.S.* 24, 34–35, 92 L.Ed. 1187, 68 *S.Ct.* 847 (1948). That doctrine derives from the basic notion that no court will lend its aid to one who founds a cause of action upon an immoral or illegal act, and is further justified by the observation that the public's interests in confining the scope of private agreements to which it is not a party will go unrepresented unless the judiciary takes account of those interests when it considers whether to enforce such agreements.

> \*       \*       \*       \*       \*       \*       \*       \*

> In *W.R. Grace,* we recognized that "a court may not enforce a collective-bargaining agreement that is contrary to public policy," and stated that "the question of public policy is ultimately one for resolution by the courts." 461 *U.S.,* at 766, 76 *L.Ed.*2d 298, 103 *S.Ct.* 2177. We cautioned, however, that a court's refusal to enforce an arbitrator's *interpretation* of such contracts is limited to situations where the contract as interpreted would violate "some explicit public policy" that is "well defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" \* \* \* Two points follow from our decision in *W.R. Grace.* First, a court may refuse to enforce a collective-bargaining agreement when the specific terms contained in that agreement violate public policy. Second, it is apparent that our decision in that case does not otherwise sanction a broad judicial power to set aside arbitration awards as against public policy. Although we discussed the effect of that award on two broad areas of public policy, our decision turned on our examination of whether the award created any explicit conflict with other "laws and legal precedents" rather than an assessment of "general considerations of supposed public interests." 461 *U.S.,* at 766, 76 *L.Ed.*2d 298, 103 *S.Ct.* 2177. At the very least, an alleged public policy must be properly framed under the approach set out in *W.R. Grace,* and the violation of such a policy must be clearly shown if an award is not to be enforced.

> [*Id.* at 42–43, 108 *S.Ct.* at 373–74, 98 *L.Ed.*2d at 301–02.]

In that connection, the Court observed that the Court of Appeals had "made no attempt to review existing laws and legal precedents in order to demonstrate that they establish a 'well-defined and dominant' policy against the operation of dangerous machinery while under the influence of drugs." *Id.* at 44, 108 *S.Ct.* at 373, 98 *L.Ed.*2d at 302–03.

Moreover, while acknowledging the relevance to the Court of Appeals' public-policy analysis of the presence of marijuana in Cooper's car, the Supreme Court criticized the Fifth Circuit for relying on that evidence to support the assumption that Cooper's reinstatement would offend the public policy that discourages the operation of hazardous machinery by persons using drugs:

> In any event, it was inappropriate for the Court of Appeals itself to draw the necessary inference. To conclude from the fact that marijuana had been found in Cooper's car that Cooper had ever been or would be under the influence of marijuana while he was on the job and operating dangerous machinery is an exercise in factfinding about Cooper's use of drugs and his amenability to discipline, a task that exceeds the authority of a court asked to overturn an arbitration award. The parties did not bargain for the facts to be found by a court, but by an arbitrator chosen by them who had more opportunity to observe Cooper and to be familiar with the plant and its problems. Nor does the fact that it is inquiring into a possible violation of public policy excuse a court for doing the arbitrator's task. [*Id.* at 44–45, 108 *S.Ct.* at 374, 98 *L.Ed.*2d at 303.]

In *Misco*, the Court expressly declined to resolve whether "a court may refuse to enforce an award on public policy grounds only when the award itself violates a statute, regulation, or other manifestation of positive law, or compels conduct by the employer that would violate such a law." *Id.* at 45 n. 12, 108 *S.Ct.* at 374 n. 12, 98 *L.Ed.*2d at 304 n. 12. As a result, federal courts after *Misco* continue to ponder the appropriate standard under which arbitration awards can be vacated because of public-policy concerns. In *Exxon Shipping Co. v. Exxon Seamen's Union*, 993 *F.*2d 357 (3d Cir.1993), the Third Circuit Court of Appeals affirmed a district court's judgment vacating an arbitration award that had reinstated an oil tanker helmsman who had been discharged on the basis of a positive drug test administered after his ship had run aground. The court noted the distinction between those Courts of Appeals that restrict the power to vacate arbitration awards on public-policy grounds only to cases in which the award violates a statute, regulation or other manifestation of positive law, and those courts that permit arbitration awards to be vacated if they are " 'inconsistent with some significant public policy.' " *Id.* at 363 (quoting *E.I. DuPont de Nemours & Co. v. Grasselli Employees Indep. Ass'n*, 790 *F.*2d 611, 616 (7th Cir.)

(quoting Robert A. Gorman, *Labor Law—Unionization and Collective Bargaining* 597 (1976)), *cert. denied,* 479 *U.S.* 853, 107 *S.Ct.* 186, 93 *L.Ed.*2d 120 (1986)). Noting that "the distinction between an award which violates a manifestation of positive law and an award which is 'inconsistent with public policy' is often blurred," 993 *F.*2d at 363, the Third Circuit expressed its preference for the broader standard, observing that "the contours of positive law are broad enough to include not just specific rules or prohibitions but also the stated purposes behind these rules or prohibitions." *Id.* at 364. The court concluded that the arbitrator's award reinstating the helmsman would undermine the purpose of Coast Guard regulations intended to limit the use of intoxicants by merchant marine personnel in order to achieve a drug-free work environment. *Ibid.*

Commentators also are divided over the scope of the public policy exception. Most favor a narrow reading of *W.R. Grace* and *Misco. See, e.g.,* Harry T. Edwards, *Judicial Review of Labor Arbitration Awards: The Clash Between the Public Policy Exception and the Duty to Bargain,* 64 *Chi.–Kent L.Rev.* 3, 34 (1988); Michael H. Gottesman, *Enforceability of Awards: A Union Viewpoint,* 41 *Ann.Meeting Nat'l Acad.Arb.* 88, 96 (1988); Timothy J. Heinsz, *Judicial Review of Labor Arbitration Awards: The* Enterprise Wheel *Goes Around and Around,* 52 *Mo.L.Rev.* 243, 276 (1987); Deanna J. Mouser, *Analysis of the Public Policy Exception after* Paperworkers v. Misco: *A Proposal to Limit the Public Policy Exception and to Allow the Parties to Submit the Public Policy Question to the Arbitrator,* 12 *Indus.Rel.L.J.* 89, 146–48 (1990). Others endorse a more flexible view of the public-policy exception to enhance the judiciary's capacity to vacate arbitration awards that impair important public interests. John E. Dunsford, *The Judicial Doctrine of Public Policy:* Misco *Reviewed,* 4 *Lab. Law.* 669, 680–81 (1988); Carie Fox & Brian Gruhn, *Toward a Principled Public Policy Standard: Judicial Review of Arbitrators' Decisions,* 1989 *Det.C.L.Rev.* 863, 897–98 (1989); William B. Gould IV, *Judicial Review of Labor Arbitration Awards—Thirty*

*Years of the* Steelworkers Trilogy: *The Aftermath of AT & T and* Misco, 64 *Notre Dame L.Rev.* 464, 488–89 (1989).

### B

Unlike *Heher v. Smith, Stratton, Wise, Heher & Brennan,* 143 *N.J.* 448, 672 *A.*2d 1147 (1995), also decided today, this appeal does not present directly the question whether law-firm agreements requiring arbitration of disputes are enforceable if the dispute in question implicates public-policy issues governed by the Rules of Professional Conduct. Nevertheless, our disposition of this appeal necessarily reflects our full agreement with the Appellate Division's conclusion that "[a] practicing lawyer sitting as an arbitrator pursuant to the Carpenter, Bennett & Morrissey partnership agreement is obligated and competent to determine the meaning and validity of its forfeiture provisions in light of the Rules of Professional Conduct as interpreted by our courts." 275 *N.J.Super.* at 400, 646 *A.*2d 473. Our longstanding endorsement of arbitration as a favored remedy, see *Faherty, supra,* 97 *N.J.* at 105, 477 *A.*2d 1257, reflects its value as a procedure for resolving disputes out of court that in the process combines the advantages of privacy and efficiency. Its virtues have special application to conflicts arising out of agreements between lawyers in practice together. Such conflicts are best resolved quickly and efficiently, and the parties' best interests are likely to be served by a dispute-resolution process that limits notoriety about the underlying issues.

That the dispute may require the arbitrator to address and resolve issues that affect public policy does not lead to the conclusion that the parties must forego the advantages of arbitration and turn at once to the courts. Our precedents indicate instead that the parties must proceed to arbitration, and the arbitrator will consider and resolve the public-policy aspects of the dispute in a manner that vindicates the interests and goals advanced by the underlying public policy, subject to the appropriate standard of judicial review. *See Tretina, supra,* 135 *N.J.* at 364–

65, 640 *A.*2d 788; *Faherty, supra,* 97 *N.J.* at 107–10, 477 *A.*2d 1257; *see also Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 *U.S.* 614, 628, 105 *S.Ct.* 3346, 3354, 87 *L.Ed.*2d 444, 456 (1985) (holding that claims under federal anti-trust laws are subject to agreement to arbitrate, and noting that "[b]y agreeing to arbitrate a statutory claim, a party does not forego the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum"); *cf. Hackett v. Milbank, Tweed, Hadley & McCloy,* 80 *N.Y.*2d 870, 871–72, 587 *N.Y.S.*2d 598, 599, 600 *N.E.*2d 229, 230 (1992) (holding that controversy over withdrawing law partner's right to receive supplemental payments from law firm should be decided initially by arbitrator, and collateral public-policy issues can be resolved by courts on motion to vacate or confirm award).

Recognition that an agreement to arbitrate disputes implicating public-policy questions potentially could subject the award to enhanced judicial review may prompt the parties to draft an arbitration clause designed to facilitate that review. We note that before commencement of the arbitration involved in this appeal the parties stipulated that the arbitrator would issue a written opinion incorporating all factual findings and legal conclusions, and would apply New Jersey law in the resolution of legal issues. We neither impose nor recommend specific conditions concerning the formality of arbitration hearings and arbitration decisions that implicate public-policy questions, but simply acknowledge the observation that adequate explanation of the factual findings and legal conclusions that support an award facilitates judicial review. See *Virgin Islands Nursing Association's Bargaining Unit v. Schneider,* 668 *F.*2d 221, 224 (3d Cir.1981) (declining to require arbitral opinions but noting that parties may "negotiate for more formal arbitral decisionmaking in their collective bargaining contract"); *Gould, supra,* 64 *Notre Dame L.Rev.* at 491–93 (recommending detailed fact-finding when arbitrator is required to resolve public-policy issues).

We need not resolve on this record the question left unanswered by the Supreme Court in *Misco, supra*—whether enhanced judi-

cial review of arbitration awards on public-policy grounds is appropriate only when "the award itself violates a statute, regulation, or other manifestation of positive law," 484 *U.S.* at 45 n. 12, 108 *S.Ct.* at 374 n. 12, 98 *L.Ed.*2d at 304 n. 12—although we are impressed by the Third Circuit's analysis in *Exxon Shipping, supra*, 993 *F.*2d at 362–64, arguing in favor of a broader standard. Our own precedents demonstrate quite clearly that the Rules of Professional Conduct, at least to the extent that they are designed and interpreted to protect the public interest, express a clear mandate of public policy. *See Pierce v. Ortho Pharmaceutical Corp.*, 84 *N.J.* 58, 72, 417 *A.*2d 505 (1980). Accordingly, our holding in *Jacob, supra*, 128 *N.J.* at 22, 607 *A.*2d 142, that a law-firm agreement that withheld termination compensation only from those former partners who represented firm clients or solicited firm employees within one year of termination violated *RPC* 5.6, itself constitutes a clear mandate of public policy. Thus, the critical question is not whether the subject matter and the award in the underlying arbitration sufficiently implicate a clear mandate of public policy to warrant our consideration of the appropriate standard of judicial review. They do. Rather, our task is to determine the circumstances under which an arbitration award that implicates a clear mandate of public policy should be subjected to judicial intervention to safeguard the public interest. We note that the federal precedents are not dispositive because they deal primarily with arbitration of labor disputes, a class of cases in which the federal courts traditionally have extended expansive deference to arbitral awards.

■ Our resolution of that issue is informed by our strong preference for judicial confirmation of arbitration awards untainted by "fraud, corruption or similar wrongdoing." *Perini, supra*, 129 *N.J.* at 548, 610 *A.*2d 364 (Wilentz, C.J., concurring). We are persuaded that the standard advocated by the Chief Justice in his *Perini* concurrence and ultimately adopted by the Court in *Tretina, supra*, 135 *N.J.* at 358, 640 *A.*2d 788, ordinarily will govern even if the arbitration award implicates a clear mandate of public

policy. Assuming that the arbitrator's award accurately has identified, defined, and attempted to vindicate the pertinent public policy, courts should not disturb the award merely because of disagreements with arbitral fact findings or because the arbitrator's application of the public-policy principles to the underlying facts is imperfect. If the correctness of the award, including its resolution of the public-policy question, is reasonably debatable, judicial intervention is unwarranted. The judiciary's duty to provide an enhanced level of review of such arbitration awards is discharged by a careful scrutiny of the award, in the context of the underlying public policy, to verify that the interests and objectives to be served by the public policy are not frustrated and thwarted by the arbitral award.

However, if the arbitrator's resolution of the public-policy question is not reasonably debatable, and plainly would violate a clear mandate of public policy, a court must intervene to prevent enforcement of the award. In such circumstances, judicial intervention is necessary because arbitrators cannot be permitted to authorize litigants to violate either the law or those public-policy principles that government has established by statute, regulation or otherwise for the protection of the public. As one federal court observed in an analogous context: "[T]he Court is not attempting to second-guess the arbitrator. It is actually concerned with the *lawfulness of its enforcing* the award and not with the *correctness of the arbitrator's* decision." *International Union, UAW Local 985 v. W.M. Chace Co.*, 262 *F.Supp.* 114, 117 (E.D.Mich.1966).

A recent decision by the New York Court of Appeals is consistent with the standard of review that we adopt. In *Hackett v. Milbank, Tweed, Hadley & McCloy*, 86 *N.Y.*2d 146, 630 *N.Y.S.*2d 274, 654 *N.E.*2d 95 (1995), a law firm's partnership agreement provided for several types of payments to withdrawing partners, including repayment of capital, payment of undistributed net profits, and a supplemental payment over five years equal to 150% of the withdrawing partner's final percentage of the firm's average annual net profit during the three years preceding withdrawal.

However, a recent amendment provided that the annual amounts of the supplemental payments would be reduced dollar-for-dollar to the extent that the withdrawing partner's annual earned income from any source exceeded $100,000. Hackett withdrew from the firm to become a partner at another large New York law firm, and Milbank, Tweed declined to make any supplemental payments to Hackett because his annual earnings exceeded $100,000 by more than the amount of the annual payment due under the formula. In the ensuing arbitration, the arbitrator found as a fact that the supplemental payment was not intended to represent a withdrawing partner's share of undistributed firm income but rather "was intended primarily to provide an economic safety net for partners departing to less lucrative positions." 630 *N.Y.S.*2d at 278, 654 *N.E.*2d at 99. The arbitrator further determined that the restriction on entitlement to supplemental payments was enforceable against Hackett because it was "competition neutral" and did not restrict the practice of law, the dollar-for-dollar reduction applying without regard to the source of income. Reversing the lower court's decision to vacate the award on public-policy grounds, the Court of Appeals observed:

> Similar concerns underlie our strong public policy favoring arbitration. Where the parties have agreed to submit their dispute to binding arbitration, an award that is not clearly in violation of public policy should be given effect. The arbitrator's award here both factually and legally answers the public policy challenge raised by petitioner. Whether or not we agree with his findings and conclusions, the award does not on its face clearly violate public policy, and should not have been vacated on that basis.
>
> [630 *N.Y.S.*2d at 281, 654 *N.E.*2d at 102 (citations omitted).]

The arbitrator's decision in this appeal incorporated his legal conclusion that Paragraph 10 of the CB & M partnership agreement, which required partners that withdrew from the firm prior to age sixty-five for reasons other than death, disability, or judicial appointment to forfeit their capital accounts, "discourages a partner from leaving and becoming competitive with the firm [and therefore] is violative of *RPC* 5.6." This Court is conversant with and responsible for the vindication of the public policy underlying *RPC* 5.6, and we are fully persuaded that the arbitra-

tor's determination accurately reflects the mandate of that public policy. Were we required to address that issue on its merits, we would agree with the arbitrator's conclusion and would hold, consistent with our ruling in *Jacob, supra,* that Paragraph 10 of the CB & M agreement violates *RPC* 5.6. The contention that Paragraph 10's impact would affect partners that withdrew from the firm to pursue any occupation, not only the practice of law, does not overcome the inescapable inference that the provision's dominant purpose was to dissuade partners from competing with the firm after withdrawal. On that issue, we agree with the Appellate Division's determination that that aspect of the award must be confirmed.

We note in passing our concern that retroactive application of our decision in *Jacob, supra,* not result in extreme unfairness to law firms that prepared their agreements before *Jacob* was decided. We are satisfied that no such unfairness is reflected by this record. The arbitrator observed that the partners' capital accounts initially were credited with a lump-sum amount on admission to partnership, and subsequently were increased annually to reflect each partner's proportionate interest in the amount expended by the firm for capital assets, noting that under the partnership agreement capital assets acquired by the firm were to be proportionately charged against the partners' distributable net income and owned by the partners in the same proportion. Although CB & M did not fund the partners' capital accounts or reduce their value to reflect depreciation, the arbitrator characterized the capital accounts as reflecting "a formula devised to set up what the firm agreed would be a fair amount to pay [withdrawing] partners." Hence, we perceive no injustice resulting from the arbitrator's retroactive application of *Jacob* to the CB & M agreement.

### III

Our rule of deference to arbitrators' awards that implicate a clear mandate of public policy but do not clearly violate that

mandate ordinarily would prompt us to uphold the arbitrator's determination that Weiss was estopped from contesting the validity of the forfeiture provision in Paragraph 10 of the CB & M agreement. We note, however, that the rule of deference is conditioned on the assumption that the arbitrator will "consider and resolve the public-policy aspects of the dispute in a manner that vindicates the interests and goals advanced by the underlying public policy." *Supra* at 440, 672 *A.*2d at 1143. In respect of the question of applying estoppel against Weiss, our concern is that the relationship between the estoppel doctrine and the policy objectives underlying *RPC* 5.6 requires additional clarification to avoid inconsistent results in both judicial and arbitration proceedings.

Our observation in *Jacob* about the possible application of the equitable estoppel doctrine was as follows:

> We note that equitable principles might bar a plaintiff's recovery if the plaintiff had been a senior partner instrumental in drafting a restrictive agreement, imposing it on his or her fellow partners or employees, and then sought to have the provision declared unenforceable when he or she decided to leave.
>
> [128 *N.J.* at 36, 607 *A.*2d 142.]

The obvious premise was that the public policy prohibiting enforcement of forfeiture provisions that discourage withdrawal from and competition with law firms would not significantly be disserved if such provisions occasionally were enforced against isolated partners who were uniquely instrumental in implementing and enforcing such provisions.

However, we did not intend to suggest that any senior partner in any law firm involved in the drafting or enforcement of an invalid forfeiture provision of a law-firm agreement would be estopped from challenging the provision on withdrawal from the firm. Such a rule would sweep too broadly, and as a practical matter would bar most senior partners of most large law firms from contesting forfeiture provisions that are invalid and disserve the public interest. Preparation of a partnership agreement generally is a collective endeavor; few senior partners in large law firms could claim a complete lack of involvement in the process.

Similarly, the decision to enforce a forfeiture provision against a withdrawing partner is likely to involve a collaborative decisional process by the senior partners. Accordingly, our observation in *Jacob* about equitable estoppel should be understood to refer to a unique and extraordinary exercise of control by a dominant partner in a law firm, one who initiated and demanded the inclusion of the forfeiture provision in the firm's agreement and subsequently exerted a dominating influence in insisting that the forfeiture provision be enforced against withdrawing partners.

That narrowing construction of our language in *Jacob* demonstrates that its objective was to avoid the apparent unfairness of allowing an exceptionally influential dominant partner in a law firm to challenge the validity of a forfeiture provision that he or she initiated and implemented virtually single-handedly. The estoppel doctrine should not apply to the ordinary senior partner who merely participated in the partnership decisions to adopt and enforce the provision.

By that standard, we are satisfied that Weiss cannot be estopped from challenging Paragraph 10 of the CB & M agreement. As the arbitrator observed, the forfeiture concept reflected by Paragraph 10 already was included in the CB & M agreement at the time Weiss was admitted to partnership. Although Weiss served on the firm's Executive Committee, no evidence demonstrated that he played a unique role in perpetuating or enforcing the forfeiture provision. Although Weiss, along with the other partners, may have benefitted when the forfeiture provision was enforced against withdrawing partners, the record does not reflect that Weiss's role in the enforcement process was dominant or significantly different from that of other members. Similarly, his court appearance in a partner's divorce proceeding to resist a subpoena served on the firm was in a capacity representative of the firm's interests and did not suggest that Weiss held a dominant role in respect of enforcement of the forfeiture provision.

Absent any uncertainty about the appropriate limits of the estoppel doctrine, our approach ordinarily would require deference

to the arbitrator's estoppel determination informed by the public-policy interests underlying *RPC 5.6* and the interrelationship between those interests and principles of estoppel. However, because we conclude that uncertainty about the scope of the estoppel doctrine resulted in its misapplication to Weiss, we agree with the Appellate Division's conclusion that that aspect of the award must be vacated.

## IV

We affirm the judgment of the Appellate Division.

*For affirmance*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, GARIBALDI, STEIN and COLEMAN—6.

*Opposed*—None.