[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION STATEMENT OF THE CASE
STATEMENT OF THE CASE
These consolidated actions arise from arbitration proceedings between the law firm of Zeldes, Needle Cooper, P.C. (ZNC), and L. Douglas Shrader, a former shareholder of ZNC[*].
By an Employment Agreement dated January 1, 1990, ZNC and Shrader agreed to arbitrate "[a]ny controversy, claim or breach arising out of or pertaining to this Agreement. . . ." Following Shrader's withdrawal from ZNC, a dispute arose between Shrader and ZNC regarding, inter alia, whether Shrader was entitled to receive certain retirement benefits from ZNC, and, how the legal fees earned in the matter of Roe v. Hocon Gas were to be allocated between Shrader and his former firm. The parties submitted these issues to a panel of three arbitrators selected according to the Employment Agreement. Thereafter, the arbitration panel held numerous evidentiary hearings and received extensive memoranda. The arbitration panel rendered its award on September 17, 1996, and notified the parties of such award by letter dated September 20, 1996.
Both parties, dissatisfied with the arbitration panel's CT Page 10145 award, are now challenging the award. Shrader has applied to correct, in part, and confirm the award. Conversely, ZNC has applied to vacate the award. This court consolidated these actions on November 4, 1996.
DISCUSSION
The present controversy regarding the arbitration award centers on two determinations made by the arbitration panel. First, the panel determined that Shrader was entitled to receive certain retirement compensation from ZNC despite the fact that Shrader was practicing law in competition with ZNC. Second, concerning the allocation of legal fees derived from Roe v. HoconGas, the panel determined that ZNC was entitled to $198,010.79 and Shrader was entitled to $48,239.21.
The Retirement Benefits
ZNC seeks to vacate the panel's award of retirement compensation to Shrader on the ground that such an award violates public policy, and is therefore unenforceable, because Rule 5.6(a) of the Rules of Professional Conduct expressly permits retirement compensation to be conditioned upon agreements that restrict a lawyer's right to practice.[1] Conversely, Shrader seeks to confirm the retirement benefits portion of the arbitration panel's award on the ground that it does not violate public policy, and is therefore enforceable.
An arbitration award is properly vacated on public policy grounds "when the award is clearly illegal or clearly violative of a strong public policy." Garrity v. McCaskey, 223 Conn. 1, 7,612 A.2d 742 (1992). "[T]he public policy exception to arbitral authority should be narrowly construed and a court's refusal to enforce an arbitrator's [award] . . . is limited to situations where the [award] . . . would violate some explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of the supposed public interest." (Brackets omitted; internal quotation marks omitted.) Watertown PoliceUnion v. Watertown, 210 Conn. 333, 340, 555 A.2d 406 (1989); seeNew Haven v. AFSCME Council 15, Local 530, 208 Conn. 411, 416-17,544 A.2d 186 (1988). CT Page 10146
Initially, the parties raise the question about the standard of review the court should use to evaluate the arbitration decision. Although several Connecticut courts have vacated arbitration awards that violated public policy,[2] these cases do not set forth what standard of review shall be accorded in determining whether an arbitration award should be vacated on the ground that the award violates public policy as embodied by Rule 5.6(a).[3] Two recent cases from the highest courts of neighboring states, however, provide guidance on this issue.
In Weiss v. Carpenter, Bennett Morrissey, 143 N.J. 420,672 A.2d 1132, 1144 (1996), several withdrawing attorneys challenged a provision in their former law firm's partnership agreement that prohibited a withdrawing attorney from receiving distribution of his capital account if the withdrawing attorney withdrew for any reason other than death, permanent disability, attainment of the age of 65 or appointment to the judiciary. The Supreme Court of New Jersey held that where the "arbitrator's award accurately has identified, defined, and attempted to vindicate the pertinent public policy, courts should not disturb the award merely because of disagreements with arbitral fact findings or because the arbitrator's application of the public-policy principles to the underlying facts is imperfect. If the correctness of the award, including its resolution of the public-policy question, is reasonably debatable, judicial intervention is unwarranted. The judiciary's duty to provide an enhanced level of review of such arbitration awards is discharged by a careful scrutiny of the award, in the context of the underlying public policy, to verify that the interests and objectives to be served by the public policy are not frustrated and thwarted by the arbitral award."Id., 1144. Applying this standard of review, the Court upheld the arbitrator's determination that the provision prohibiting a withdrawing lawyer from receiving distribution of his capital account for any reason other than death, permanent disability, attainment of the age of 65 or appointment to the judiciary violated the public policy embodied in Rule 5.6. Id., 1145.
In Hackett v. Milbank, Tweed, Hadley McCloy, 86 N.Y.2d 146,630 N.Y.S.2d 274, 654 N.E.2d 95, 102 (1995), a withdrawing partner contended that his former law firm's denial of certain supplemental payments authorized under the firm's partnership agreement constituted an impermissible forfeiture of undistributed earned income and an impermissible restraint on the practice of law. The firm argued that pursuant to a provision in the firm's partnership agreement, the supplemental payments CT Page 10147 available to a withdrawing partner are reduced dollar-for-dollar to the extent that the withdrawing partner's annual earned income, from any source, exceeds $100,000. The arbitrator found that the provision permitting reduction of a withdrawing partner's supplemental payments did not offend public policy and was enforceable. On appeal, the Court of Appeals of New York, upheld the arbitrator's award and stated that "[w]here the parties have agreed to submit their dispute to binding arbitration, an award that is not clearly in violation of public policy should be given effect. . . . The arbitrator's award here both factually and legally answers the public policy challenge raised by petitioner. Whether or not we agree with his findings and conclusions, the award does not on its face clearly violate public policy, and should not [be] vacated on that basis." (Citations omitted.) Id., 102.
In summary, these standards of review, although couched in different language, are substantively the same. Indeed, the Supreme Court of New Jersey stated, "[a] recent decision by the New York Court of Appeals [Hackett v. Milbank, Tweed, Hadley McCloy, supra, 654 N.E.2d 95] is consistent with the standard of review that we adopt." Weiss v. Carpenter, Bennett Morrissey,supra, 672 A.2d 1145. Moreover, an examination of the two standards reveals that they each contain two central elements. First, both standards require that the arbitrator identify and address the public policy at issue. The Weiss standard requires that the arbitral award accurately identify, define and attempt to vindicate the pertinent public policy, Weiss v. Carpenter,Bennett Morrissey, supra, 672 A.2d 1144, while the Hackett
standard requires that the award answer, both factually and legally, the public policy challenge. Hackett v. Milbank, Tweed,Hadley McCloy, supra, 654 N.E.2d 102. Second, both standards of review indicate that an arbitral award should not be readily disturbed upon judicial review. The Weiss standard instructs that judicial intervention is unwarranted where the award's resolution of the public policy question is reasonably debatable. Weiss v.Carpenter, Bennett Morrissey, supra, 672 A.2d 1144. Similarly, the Hackett standard provides that the award should not be vacated on public policy grounds unless the award clearly violates public policy on its face. Hackett v. Milbank, Tweed,Hadley McCloy, supra, 654 N.E.2d 102. Although these standards are substantively similar, the standard of review set forth inWeiss is particularly instructive because its framework more explicitly sets forth the court's function. Therefore, this court concludes that the appropriate standard of review requires the CT Page 10148 court to review carefully the arbitration panel's award in the context of the underlying public policy, and if the panel has identified, defined and attempted to vindicate the pertinent public policy the court should not disturb the award merely because the award is imperfect, or because the award's resolution of the public policy question is reasonably debatable. See Weissv. Carpenter, Bennett Morrissey, supra, 672 A.2d 1144. On this basis, an arbitration award will be vacated on public policy grounds only when the award on its face clearly violates well established public policy. This standard of review is in accord with our Supreme Court's instruction that "[t]he public policy [ground for vacating an arbitration award] applies only when the award is clearly illegal or clearly violative of a strong public policy." Garrity v. McCaskey, supra, 223 Conn. 7.
Although this standard of review is more searching than that afforded to judicial review of an arbitration award that does not implicate public policy; see Hartford v. Board of Mediation andArbitration, 211 Conn. 7, 14, 557 A.2d 1236 (1989) ("[W]hen arbitration is consensual, rather than statutorily imposed, judicial review is limited in scope. . . . If the parties mutually agree to submit their dispute to arbitration, the resulting award is not reviewable for errors of law or fact. . . . Judicial review of unrestricted submissions is limited to a comparison between the submission and the award to see whether, in accordance with the powers conferred upon the arbitrators, their award conforms to the submission."); it does not approach de novo review.[4]
The court rejects ZNC's argument that a court must exercise de novo review of the legal conclusions reached by the panel because the Superior Court has inherent authority to govern attorney conduct. ZNC cites no authority supporting the proposition that arbitration awards involving attorneys or the Rules of Professional Conduct are subject to de novo review. Moreover, neither Weiss v. Carpenter, Bennett Morrissey, supra, 672 A.2d 1144, nor Hackett v. Milbank, Tweed, Hadley McCloy,supra, 654 N.E.2d 102, nor Perkins Mario v. Annunziata, supra,45 Conn. App. 237, adopt de novo review.
Here, § 7 of the Employment Agreement provided that employees with 25 or more years of service would be entitled to certain retirement compensation after attaining the age of 65. These employees would be entitled to such compensation whether terminated voluntarily or involuntarily before or after reaching CT Page 10149 the age of 65. The retirement compensation is equal to one-third of the terminated employee's average annual salary of the previous five years and is payable for 12 years beginning the year after the terminated employee reaches 65. However, § 7 (D) provides that the "[e]mployee shall be entitled to such compensation only if he is not actively engaged in the practice of law in Connecticut. Accordingly, notwithstanding the provisions of 7(A), 7(B), and 7(C) to the contrary, if Employee actively engages in the practice of law in State of Connecticut at any time after the termination of his employment hereunder without the express written consent of Employer (`practicing law' shall be deemed to exclude teaching, performing pro bono services, acting as a judge, mediator or arbitrator, writing articles (but not briefs) or other activities not commonly associated with a day to day legal practice), Employer shall not be obliged to provide thereafter any retirement compensation to which Employee of his estate would otherwise be entitled. . . ."
The arbitration panel began its review of § 7 by outlining the events that led to ZNC's adoption of the Employment Agreement. The panel then summarized its interpretation of the competing contentions of the parties. Shrader argued that the retirement compensation provided for in § 7 is actually deferred payment for a long-term shareholder's equity in the firm. ZNC countered that § 7 was "clearly meant to provide retirement benefits to those who had given their `occupational life' to the firm, and who had agree[d], once they left, not to compete with it so as to jeopardize those retirement [benefits], which are paid, not from past earnings, but from future revenues."
The panel then made the following observations in the Discussion and Analysis portion of its decision:
 "As to [§ 7], our primary concern must be with the public policy considerations underlying Rule 5.6. That Rule, like its counterparts elsewhere, prohibits restrictive covenants except in very limited circumstances. It is grounded on the proposition that both a lawyer's right to practice and a client's right to choose a lawyer need to be preserved and declares that covenants restricting those rights are detrimental to the public interest. . . . Thus, any provision that impinges on the public policy reflected in the Rule must be carefully scrutinized. The Employment Agreement at issue conditions CT Page 10150 the receipt of certain benefits by a departing employee on foregoing the practice of law in a particular geographic area, specifically the state of Connecticut, not for a specified period of time, as with some provisions, but for all time. Thus, [§ 7] is both a direct and indirect restrictive covenant.
 "While the firm insists that its basic purpose is to provide retirement benefits to long-term employees, it does not promise such benefits to all departing employees. It only promises benefits to those who retire and to those who do not retire so long as they enter other professions or follow other pursuits. But it withholds benefits to those who continue to practice law even though they have at least twenty-five years of service and have thus devoted the bulk of their occupational life to the firm. And it does so whether those persons leave of their own volition or are terminated by their colleagues.
 "While firms may ordinarily value assets in ways they choose, this does not mean that such valuations are free from scrutiny. When the valuation the firm has chosen here, one that eliminates elements normally considered assets, is viewed in light of the long term benefits payable under section 7(A) and the covenant at issue in 7(D), it is clear to us that the selective withholding of such significant compensation is essentially a device to strongly discourage, if not foreclose, what the firm considers `competitive' activities. As such, it surely undermines the strong public interest of allowing clients to retain counsel of their choice, which is the `paramount interest' served by the ethical rule, and unduly restricts the practice of law.
 "We understand the economic interest that might lead a firm to adopt a restriction such as that in question. But as the Rule has been interpreted, again as the [Jacob v. Norris, McLaughlin Marcus, 128 N.J. 10, 607 A.2d 142, 151
(1992)] court observed, the `commercial concerns of the firm and of the departing lawyer are secondary to the need to preserve client choice.' The significant financial disincentive embodied in this Agreement cannot be considered a reasonable balancing of interests. It is evident that a disincentive of this magnitude bears no clear relationship to the financial effect, if any, that competition may bring. It bars all competition, irrespective of its impact or whether it has any impact at all. A disincentive of this nature is more CT Page 10151 realistically viewed as a penalty, the dominant purpose of which is to prevent a withdrawing shareholder, whatever the cause of withdrawal, from representing clients of all kinds who might desire that lawyer's services, whether or not those clients were previously represented by the firm and even if the problem the client brings is not within the firm's expertise.
 "In our view, it does not matter, given the blanket nature of the prohibition and the magnitude of the penalty, that sums to be paid as `retirement compensation' are considered the shareholder's interest in the firm, i.e., sums already `earned,' or are to come from future profits. The [Cohen v. Lord, Day Lord, 75 N.Y.2d 95, 551 N.Y.S.2d 157, 550 N.E.2d 410
(1989)] court's suggestion to the contrary was considered and rejected in [Jacob v. Norris, McLaughlin Marcus]. In [Jacob v. Norris, McLaughlin Marcus], the departing partners had received their equity interest; it was additional compensation that was withheld. The court, refusing to see a principled difference, said the question was: `not what income the departing partner has a "right" to receive, it is the effect of the terms of payment on the lawyer's decision to decline or accept those clients who wish to choose him or her as counsel. If the agreement creates a disincentive to accept representation, it violates the [Rule] regardless of the lawyer's "right" to compensation.'
 "It is our opinion, based on this Record and our review of the applicable principles that the restrictive covenant embodied in section 7(D) of Shrader's 1990 Employment Agreement is in conflict with Rule 5.6(a), that is contrary to public policy and that it therefore cannot be enforced against him. "
The arbitration panel's award provided that "[t]he provision in Shrader's 1990 Employment Agreement purporting to restrict his practice of law in the state of Connecticut is in conflict with Rule 5.6(a) of the Connecticut Rules of Professional Conduct and is therefore void as against public policy and unenforceable against him. In accordance with Shrader's 1990 Employment Agreement, he is entitled to the payments specified in Section 7 thereof beginning January 1 of the year after he reaches the age of sixty-five, subject to the limitations and restrictions of said Agreement, apart from the restrictive covenant of Section 7 (D)." CT Page 10152
The arbitration panel relied on Cohen v. Lord, Day Lord,75 N.Y.2d 95, 551 N.Y.S.2d 157, 550 N.E.2d 410 (1989). InCohen, a withdrawing partner brought suit against his former law firm to recover earned but uncollected partnership revenues allegedly owed him. The firm refused to make payment to the withdrawing partner because a provision in the firm partnership agreement conditioned payment of earned but uncollected partnership revenues upon a withdrawing partner's obligation to refrain from the practice of law in competition with the former firm. The court determined that such a provision restricts the practice of law in violation of Disciplinary Rule 2-108 (A)[5] of the New York Code of Professional Responsibility and is unenforceable as against public policy. "The purpose of the rule is to ensure that the public has the choice of counsel." Cohen v. Lord, Day Lord,supra, 550 N.E.2d 411. The court held, "that while the provision in question does not expressly or completely prohibit a withdrawing partner from engaging in the practice of law, the significant monetary penalty it exacts, if the withdrawing partner practices competitively with the former firm, constitutes an impermissible restriction on the practice of law." Cohen v.Lord, Day Lord, supra, 550 N.E.2d 411.
The arbitration panel also relied on Jacob v. Norris,McLaughlin Marcus, 128 N.J. 10, 607 A.2d 142 (1992). In Jacob,
four partners brought suit against their former law firm to recover compensation allegedly owed them pursuant to a Service Termination Agreement. The firm refused payment to the withdrawing partners because the Service Termination Agreement provided that the firm had no obligation to make payments to departing partners who competed with their former firm within one year of their departure. The court held that the provision requiring the withdrawing partners to forfeit compensation "restricts the practice of law in contravention of [Rule] 5.6 and is therefore unenforceable as against public policy." Id., 155. In reaching this determination, the court made the following observations. "The history behind [Rule 5.6] and its precursors reveals that [its] underlying purpose is to ensure the freedom of clients to select counsel of their choice, despite its wording in terms of a lawyer's right to practice. [Rule 5.6] is thus designed to serve the public interest in maximum access to lawyers and to preclude commercial arrangements that interfere with that goal. See Geoffrey C. Hazard, Jr. W. William Hodes,The Law of Lawyering: A Handbook on the Model Rules ofProfessional Conduct 486 (1985)." Id., 146. "Contracts that CT Page 10153 violate [the Rules of Professional Conduct] violate public policy, and courts must deem them unenforceable." Id., 146. "[I]ndirect restrictions on the practice of law, such as the financial disincentives at issue in this case, likewise violate both the language and the spirit of [Rule] 5.6. Any provision penalizing an attorney for undertaking certain representation `restricts the right to practice law' within the meaning of [Rule 5.6]. . . . Because the client's freedom of choice is the paramount interest to be served by [Rule 5.6], a disincentive provision is as detrimental to the public interest as an outright prohibition. Moreover, if we were to prohibit direct restraints on practice but permit indirect restraints, law firms would quickly move to undermine [Rule] 5.6 through indirect means."Jacob v. Norris, McLaughlin Marcus, supra, 607 A.2d 148-49.[6]
ZNC does not contest the panel's view that Rule 5.6 implicates a public policy in favor of protecting a client's ability to freely select counsel. Rather, ZNC argues that the panel's award should be vacated because § 7(D) of the Employment Agreement falls squarely within the retirement benefits exception in Rule 5.6, and this exception itself embodies a public policy. Thus, according to ZNC, any award which contravenes the exception in Rule 5.6 is violative of public policy and likewise unenforceable. Essentially, ZNC argues that the exception within Rule 5.6 embodies a distinct public policy that favors conditioning retirement benefits upon non-competition.
ZNC directs the court to Miller v. Foulston, Siefkin, Powers Eberhardt, 246 Kan. 450, 790 P.2d 404 (1990). In Miller v.Foulston, Siefkin, Powers Eberhardt, the plaintiff, a partner in a law firm, involuntarily left his firm under threat of expulsion. Thereafter, a dispute arose between Miller and his former firm after the firm refused to pay certain retirement benefits to Miller. The firm refused to pay retirement benefits on the ground that the firm's partnership agreement provided that "if such retired partner, without the express consent of all continuing partners, re-enters the practice of law or becomes otherwise gainfully engaged or employed at an occupation associated with or related to the practice of law, then, and upon such event, the obligation of the partnership make the payments [of retirement benefits] . . . shall immediately cease and terminate and be forever forfeited by such retiring partner. . . ." Id., 408-09. Miller argued, inter alia, that this restriction contravened DR 2-108 (A) of the Kansas Code of Professional Responsibility[7] and was therefore unethical and CT Page 10154 unenforceable. In Miller, the trial court held that this partnership provision did not violate DR 2-108 (A) and was accordingly enforceable.[8] The Kansas Supreme court affirmed, holding that "DR 2-108 (A) allows restriction of the practice of law if it is a condition to payment of retirement benefits. The provisions of the [partnership agreement] which outline the requirements for one to be retired and condition the payment of retirement benefits upon the retiring partner's continuing cessation of the practice of law, come within the exception to DR 2-108. The terms of [the partnership provision] do not violate the Code of Responsibility. . . . the failure to meet these conditions makes one ineligible for the retirement benefits."Id., 411. However, the holding of the Kansas Supreme Court does not mean that the retirement benefits exception within Rule 5.6 embodies a distinct public policy favoring agreements which condition retirement benefits on non-competition. That court simply held that under the facts of Miller, the trial court did not err in holding that the partnership provision fell within the exception to DR 2-108 (A). Id.
ZNC does not cite any authority holding that the retirement benefits exception itself embodies a distinct public policy. Moreover, "[t]he Rules of Professional Conduct govern the practice of law based on ethical standards, not commercial desires. The commercial concerns of the firm and of the departing lawyer are secondary to the need to preserve client choice."Jacob v. Norris, McLaughlin Marcus, supra, 672 A.2d 151. "[E]nsuring client choice is the driving force behind [Rule 5.6]." Id., 150. Indeed, the New Jersey Supreme Court has unequivocally stated that "the Rules of Professional Conduct, at least to the extent that they are designed and interpreted to protect the public interest, express a clear mandate of public policy." (Emphasis added.) Weiss v. Carpenter, Bennett Morrissey, supra, 672 A.2d 1144.
Although the arbitration panel might have followed Miller v.Foulston, Siefkin, Powers Eberhardt, and determined that Shrader was not entitled to retirement compensation because § 7(D) fell within the retirement benefits exception in Rule 5.6, it did not. Instead, the panel relied on Cohen v. Lord, Day Lord and Jacob v. Norris, McLaughlin Marcus and determined that § 7(D) violated Rule 5.6 and was therefore unenforceable as against public policy.
Thus a review of the arbitration panel's decision and these CT Page 10155 legal authorities indicates that the panel accurately identified and defined the public policy underlying Rule 5.6 as protecting the freedom of clients to select counsel of their choice. The arbitration panel appropriately attempted to vindicate this public policy, and indeed, its determination that § 7(D) is unenforceable as applied to Shrader furthers the public policy contained in Rule 5.6 by allowing clients greater freedom to choose Shrader as their counsel. The panel's determination that § 7(D) does not fall within the exception in Rule 5.6, and is violative of public policy and unenforceable, is reasonably debatable. For these reasons, the award on its face does not clearly violate a well established public policy and this court will not disturb the arbitration panel's award regarding Shrader's retirement compensation.
 II
The Division of Legal Fees Derived From Roe v. Hocon Gas
While a partner at ZNC, Shrader acted as the lead attorney inRoe v. Hocon Gas. ZNC represented Mrs. Jean Roe, the plaintiff in this matter pursuant to a contingency fee agreement. Shrader was Mrs. Roe's trial attorney, and the jury returned a verdict in favor of Mrs. Roe in the amount of $1,400,000. Thereafter, Hocon Gas appealed from the judgment entered upon the verdict. ZNC continued to represent Mrs. Roe on appeal. Under its fee agreement with Mrs. Roe, ZNC was to be compensated for its appellate representation on an hourly basis. Shrader argued the appeal in May of 1995. Shrader was a member of ZNC when he triedRoe v. Hocon Gas and argued its appeal. Shrader resigned from ZNC following his appellate argument. After his resignation from ZNC, Shrader continued to represent Mrs. Roe, and while the appeal was still pending, Shrader negotiated a settlement of Roe v. HoconGas in the amount of $975,000. This settlement was reached in June of 1995.
A dispute arose between ZNC and Shrader regarding the allocation of the legal fees derived from Roe v. Hocon Gas. ZNC and Shrader submitted this dispute to the arbitration panel. Shrader's demand for arbitration indicated that "approximately $306,000 in attorneys fees for [the Roe] settlement are now being held in escrow."
Regarding the Roe fees, the arbitration panel rendered a total award of $246,250.00. The panel awarded $198,010.79 to ZNC CT Page 10156 and $48,239.21 to Shrader. The panel stated,
 [i]n the Roe matter, there is no evidence of the hours worked by Shrader after he left the firm, only the results he achieved. If we measure the recovery of the firm's fees by the hours that would have been billed but for the contract,[9]
the result seems low given the status of the case at the end of May. In Roe, the contract fee amounts to $246,250 and according to Respondent's Exhibit J at page 15, the hours billed plus disbursements through the jury verdict at trial amounts to $112,139.37 ($106,172.50 + $5,966.87). The firm's agreement with Mrs. Roe provides that, in addition to the contract recovery, the appeal would be billed at regularly hourly rates, entitling the firm to an additional $65,781.42; $64,178.25 in hourly fees and $1,693.17 in expenses. . . . The combined billed hours and disbursements for the trial and appeal total $178,010.79. We see no basis for discounting those hours. In fact, we are of the opinion that the firm should receive something more for its substantial investment and the long time it carried the risk of failure. Therefore, we award the firm an additional $20,000, making the total $198,010.79. For the negotiations conducted by Shrader when he was no longer an employee — assuming that the contract recovery is $246,250 — Shrader should receive the remainder, i.e. $48,239.21.
Both ZNC and Shrader are dissatisfied with the arbitration panel's award of these legal fees. They both agree that the arbitration panel failed to allocate the entire fee generated byRoe v. Hocon Gas. However, they disagree as to the exact amount of the Roe fees. ZNC claims that the Roe fees totaled $306,843.75.[10] Shrader now claims that the Roe fees totaled $318,088.29.[11] In either event, it is clear that the panel issued an award that only totalled $246,250.00.
The parties also differ regarding the proper remedy for the arbitration panel's deficient award. ZNC seeks to vacate the arbitration panel's division of the legal fees. Conversely, Shrader seeks to correct and confirm the panel's division of the fees.
ZNC sets forth three arguments in support of its motion to vacate. First, ZNC argues that the award must be vacated pursuant to General Statutes § 52-418 (a)(4)[12] because the panel did not render a "final and definite award upon the subject CT Page 10157 matter submitted." Second, ZNC argues that the award must be vacated as illegal and against public policy because Shrader was awarded a contingency fee in the absence of any evidence of a written fee agreement with Roe. Finally, ZNC argues that the award must be vacated because the panel exhibited a manifest disregard of, and a patently irrational application of, the law in awarding Shrader over $48,000 in legal fees for two weeks of settlement negotiations.
Shrader responds that the panel's award as to the Roe fees should be corrected[13] and confirmed.[14] Shrader argues that the arbitration panel intended to award Shrader whatever portion of the Roe fee remained after ZNC was awarded its fee of $198,070.19. Thus, Shrader contends that he is entitled to a corrected fee of $120,077.50 because $318,088.29 (total Roe fee according to Shrader) less $198,010.79 (ZNC's portion of Roe fee) equals $120,077.50 (Shrader's portion of the Roe fee). Shrader contends that the panel's award of $48,239.21 rather than $120,077.50 is a mere mathematical miscalculation, an evident mistake, that this court can correct.
Although the parties disagree as to the exact amount of theRoe fees, it is undisputed that the Roe fees amounted to more than $300,000.00. The arbitration award only allocated $246,250.00. Accordingly, the panel failed to make a final and definite award on the subject matter submitted as required by General Statutes § 52-418 (a)(4). Moreover, the fact that the exact amount of the Roe fees remains in dispute underscores the fact that the panel failed to a render a definite award. Indeed, the court is in a quandary with respect to the actual amount of the Roe fees. This determination should necessarily have been made by the arbitration panel, but was not. The intent of the panel and the amount of the Roe fees are so unclear as to prevent this court from simply "correcting" the award. It would be patently imprudent for this court to attempt to correct such an award when the award itself is so confusing and the parties themselves, even after the arbitrators' decision, cannot agree on the total amount that was submitted to the panel for arbitration. Therefore, ZNC's motion to vacate the arbitration award as it pertains to the fees derived from Roe v. Hocon Gas is granted.
Because the court has determined that ZNC's motion to vacate should be granted with respect to the Roe fees on the ground that the arbitrators failed to render a final and definite award pursuant to § 52-418 (a)(4), the court need not to address CT Page 10158 ZNC's alternative arguments supporting its motion to vacate and Shrader's motion to correct. However, because further arbitration proceedings are possible, nay probable, the court is compelled to identify a number of concerning issues.
Rule of Professional Conduct 1.5(a) requires that a lawyer's fee be reasonable.[15] Thus, a relevant question is whether a $48,239.21 attorney fee award to Shrader for his two weeks of settlement negotiations is reasonable.[16] The court notes that according to Shrader's reasoning, this award should have been $120,077.50, rather than $48,239.21. Additionally, Rule 1.5(b) requires an attorney's fee arrangement to be communicated to the client in writing;[17] and Rule 1.5(e) particularly requires a contingency fee agreement to be in writing.[18] The record does not indicate whether Shrader had a written fee agreement with Mrs. Roe after he left ZNC. Thus, other relevant questions are how the existence or nonexistence of a written fee agreement between Mrs. Roe and Shrader affects whether Shrader's award should be determined through a contingency fee percentage, quantum meruit, or some other basis. The court does not express any opinion on these issues or the extent to which their resolution may implicate public policy concerns. See generallyPerkins Mario, P.C. v. Annunziata, supra, 45 Conn. App. 237.
CONCLUSION
Therefore, for the foregoing reasons, the arbitration award is confirmed as it pertains to Shrader's retirement benefits and is vacated as it pertains to the allocation of fees derived fromRoe v. Hocon Gas.
[*] Editor's Note: For an earlier opinion in this matter, see 19 CONN. L. RPTR. No. 14, 472 (August 4, 1997).
Stevens, J.