RONALD EISENSTEIN & another[1] *vs.* DAVID G. CONLIN, P.C.,
& others[2]; NIXON PEABODY, LLP, third-party defendant
(and a companion case[3]).

Suffolk. January 6, 2005. - May 16, 2005.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Partnership,* Attorneys, Agreement, Fiduciary duty, Withdrawal of partner.
*Public Policy. Fiduciary.*

Discussion of Mass. R. Prof. C. 5.6, 426 Mass. 1411 (1998), which prohibits
   lawyers from offering or making a partnership agreement that restricts the
   right of a lawyer to practice after termination of the relationship. [262-263]
In a Superior Court action brought by a law firm (firm) against certain former
   partners, seeking to enforce certain provisions of the firm's partnership
   agreement that contractually bound the former partners to share fees that
   they earned, after they left the firm, from the firm's current and former
   clients, the judge properly granted summary judgment in favor of the
   former partners, where the provisions, which imposed on the former
   partners obvious economic disincentives to competition that could not
   reasonably be justified by any legitimate interest the firm had in its own
   survival, impinged on the strong public interest in allowing clients to retain
   counsel of their choice, in violation of Mass. R. Prof. C. 5.6, 426 Mass.
   1411 (1998), and were therefore unenforceable [263-265]; further, no other
   issues of material fact remained to preclude the judge's grant of summary
   judgment in favor of the former partners on the firm's remaining claims,
   which were based on the former partners' alleged breach of the unenforce-
   able provisions [265-267].

CIVIL ACTIONS commenced in the Superior Court Department
on May 15, 2001, and August 16, 2001, respectively.

The cases were heard by *Allan van Gestel,* J., on motions for
summary judgment.

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.

[1]David Resnick.

[2]David G. Conlin; George W. Neuner; George W. Neuner, P.C.; and Dike,
Bronstein, Roberts & Cushman, LLP. Except as otherwise indicated, we
identify the defendants, together with Sewall P. Bronstein, P.C., collectively as
DBRC.

[3]Sewall P. Bronstein, P.C. *vs.* Ronald Eisenstein & others.

*Robert J. Harrington* (*Robert W. Harrington* with him) for David G. Conlin, P.C., & others.

*Joseph J. Leghorn* for Ronald Eisenstein & another.

MARSHALL, C.J. In 1999, Ronald Eisenstein and David Resnick resigned from the law firm Dike, Bronstein, Roberts & Cushman LLP (DBRC) to become partners in another law firm. Several DBRC clients retained them in the new firm. Eisenstein and Resnick, their new firm, and DBRC became embroiled in litigation over those events, resulting in this appeal. At issue is the enforceability of provisions of the DBRC partnership agreement (agreement) that require departing partners to remit payment to DBRC a portion of the fees they generate at their new firm as a result of work performed for certain current and former DBRC clients. DBRC appeals from a Superior Court judge's grant of summary judgments in favor of Eisenstein, Resnick, and their new firm, concluding that the disputed provisions are unenforceable as against public policy. We transferred the case here on our own motion to determine whether a law firm may contractually bind former partners to share fees they earn from the firm's current and former clients after the partners leave the firm. We conclude that, in the circumstances of this case, the provisions in controversy impinge on the "strong public interest in allowing clients to retain counsel of their choice," *Meehan* v. *Shaughnessy*, 404 Mass. 419, 431 (1989) (*Meehan*), and are therefore unenforceable. We affirm.

1. *Background.* Viewed most favorably to DBRC, the non-moving party, the facts are as follows. The predecessor of DBRC was established in 1971 as a law firm specializing in patent, trademark, and copyright law. During the relevant period, the firm was organized pursuant to the agreement, which had been drafted in 1978 and subsequently amended several times. The agreement provides that, for compensation purposes, partners receive different levels of credit for work performed for the firm's clients. A partner receives credit for 100% of billings for clients "credited" to that partner, that is, clients whom the partner brought to the firm, even if other partners later obtain new work from the clients. A partner is credited for 90% of billings for noncredited clients, that is, clients attributed to another

DBRC partner, with the remaining 10% credit going to the originating partner.[4]

Paragraph 5A of the agreement provides that when a partner retires "from the practice of patent, trademark and/or copyright law" or on the partner's death, the remaining partners "or any individual partner practicing alone or with another firm" must pay to the partner or the partner's estate 10.5% per cent of billings for the retired or deceased partner's credited clients.[5,6] Paragraph 5B obligates any partner who withdraws from DBRC to pay to a remaining DBRC partner (or the partner's estate) 15% of billings for each noncredited client for whom the departing partner performed work after withdrawing from DBRC. The required payments were to be made for a period of four years after the former partner's withdrawal from DBRC.[7,8]

Eisenstein became a partner at DBRC in 1989. Resnick

[4]DBRC asserts that the provisions designating "credited" and noncredited clients provide "incentives to a partner for bringing clients to the firm" and encourage "each partner to allow access to his or her clients to the other partners."

[5]Paragraph 5A, in relevant part, states as follows: "Upon any partner's retirement from the practice of patent, trademark and/or copyright law . . . during the term of this agreement or thereafter, this firm, any continuing or succeeding firm which includes any of the remaining partners, or any individual partner practicing alone or with another firm, *shall pay to the retired partner or his estate ten and one-half percent (10.5%) of the receipts* for services and 'mark ups' . . . for the retired partner's clients . . . which are received by this firm or such continuing or succeeding firm or such individual partner or such other firm with which he is practicing, whichever the case may be" (emphasis added).

[6]DBRC represents that paragraph 5A "is the only retirement benefit that [DBRC] partners agreed to undertake for one another."

[7]Paragraph 5B, in relevant part, states as follows: "Upon termination of the partnership or withdrawal of a partner, each partner shall for a period of four (4) years from the date of termination or withdrawal, whichever the case might be, *pay to the partner (or his estate) who is credited with the client . . . and with whom said each partner is no longer practicing, fifteen percent (15%) of receipts* for 'mark ups' and services for such client received by said each partner or any other firm with which he is practicing or of which he is a partner . . ." (emphasis added).

[8]In 1994, at the request of DBRC and a former partner who is not a party to this litigation, the Committee on Professional Ethics of the Massachusetts Bar Association (committee) evaluated these paragraphs and advised that they were ethical. Contrary to DBRC's assertion, however, the committee expressly refrained from addressing whether they were enforceable. The committee is-

became a partner at DBRC in 1995. Both men executed amendments to the agreement that ratified the terms and conditions of the agreement. In 1999, Eisenstein and Resnick left DBRC to accept positions as partners in the firm Peabody & Brown, a predecessor firm to Nixon Peabody, LLP. At Nixon Peabody they both performed legal work for certain present and former clients of DBRC.[9]

In May, 2001, Eisenstein and Resnick filed their complaint in the Superior Court against the DBRC entities other than Sewall P. Bronstein, P.C., seeking an accounting and the payment of amounts allegedly due to them pursuant to the agreement for their share of profits, personal property, and a return of their capital contribution. The defendants responded with a twenty-two count counterclaim alleging, among other things, that Eisenstein and Resnick had unjustly enriched themselves and breached their contractual and fiduciary obligations to DBRC by failing to make payments pursuant to paragraphs 5A and 5B of the agreement, by disclosing confidential client information and portions of the agreement to Nixon Peabody, and by unfairly siphoning clients from DBRC. The DBRC parties also brought a third-party claim against Nixon Peabody and an unnamed partner thereof alleging intentional interference with advantageous relations and civil conspiracy.[10] On August 16, 2001, Sewell P. Bronstein, P.C.,[11] filed suit against Eisenstein and Resnick, asserting the same causes of action as the other DBRC

sued its advice before our decision in *Pettingell* v. *Morrison, Mahoney & Miller*, 426 Mass. 253, 255 (1997) (*Pettingell*), which we discuss *infra*.

[9]On July 1, 2000, DBRC's remaining partners joined Edwards & Angell, LLP.

[10]References to Nixon Peabody designate both the firm and the unnamed partner, as well as the predecessor firm Peabody & Brown.

[11]Sewall P. Bronstein, P.C., withdrew as a DBRC partner and executed an "Of Counsel Agreement" with DBRC effective January 1, 1996, when Eisenstein and Resnick were still DBRC partners. Paragraph 8 of that agreement provided, in pertinent part:

> "The benefits provided to a retired partner in Paragraph 5A of the Partnership Agreement . . . and as applied to [Sewall P. Bronstein, P.C.] shall be held in abeyance until the termination of this Agreement, whereupon [Sewall P. Bronstein, P.C.] will be entitled to such benefits as though [Sewall P. Bronstein, P.C.] had retired on the day after the last day of this Agreement."

parties. Following the filing of several motions unrelated to this appeal and extensive discovery, in March, 2003, Eisenstein and Resnick and Nixon Peabody moved for summary judgment alleging that paragraphs 5A and 5B, on which the claims against them were grounded, were void and unenforceable. The Superior Court judge agreed and, in April, 2003, granted summary judgments in favor of Eisenstein, Resnick, and Nixon Peabody on all claims in the two cases. DBRC (including Sewell P. Bronstein, P.C.) appealed from the judgments,[12] and we transferred the case here on our own motion.

2. *Discussion.* In their summary judgment motions, Eisenstein and Resnick and Nixon Peabody argued that the provisions of the agreement on which DBRC's counterclaims rely are unenforceable because they violate Mass. R. Prof. C. 5.6, 426 Mass. 1411 (1998).[13] We first discuss rule 5.6 and then turn to a discussion of the merits.

a. *Rule 5.6.* Rule 5.6 provides in pertinent part: "A lawyer shall not participate in offering or making . . . a partnership . . . agreement that restricts the right of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement . . . ."

Rule 5.6 exists to protect the strong interests clients have in being able to choose freely the counsel they determine will best represent their interests. The rule furthers the client's right freely to select counsel by prohibiting attorneys from engaging in certain practices that effectively shrink the pool of qualified attorneys from which clients may choose. See *Pettingell* v. *Morrison, Mahoney & Miller,* 426 Mass. 253, 257 (1997) (*Pettingell*) (rule safeguards interests of clients by providing "the fullest possible freedom of choice to clients" in selecting counsel). See also *id.* at 255 (rule designed primarily to protect "the

---

[12]Eisenstein and Resnick prevailed in the Superior Court on their initial claims for money owed them pursuant to the DBRC partnership agreement. DBRC does not appeal from that result and has satisfied the judgment. Edwards & Angell, LLP, which had been a reach-and-apply defendant on those claims, is no longer a party to this case. See note 9, *supra.*

[13]Rule 5.6 of the Massachusetts Rules of Professional Conduct, 426 Mass. 1411 (1998), is substantively identical to the predecessor rule it replaced, S.J.C. Rule 3:07, Canon 2, DR 2-108 (A), 382 Mass. 773 (1981). See *Pettingell, supra* at 255 n.4.

interests of clients, not the interrelationship of the partners and former partners as such"). As we explained in *Meehan* and *Pettingell*, the "strong public interest in allowing clients to retain counsel of their choice outweighs any professional benefits derived from" provisions that restrict "the right of a lawyer to practice law after the termination of a relationship created by the agreement." *Meehan, supra* at 431. *Pettingell, supra* at 255. Thus, in *Pettingell*, we voided provisions of a partnership agreement that required a partner to forfeit payments to which he otherwise would be entitled had he not withdrawn from, and then competed with, his former firm because an "enforceable forfeiture-for-competition clause would tend to discourage a lawyer who leaves a firm from competing with it," which "in turn would tend to restrict a client or potential client's choice of counsel."[14] *Id.* at 257.

The scope of rule 5.6 is not limited to agreements that directly penalize a withdrawing attorney for competing by denying that attorney compensation already earned while at the firm. See *id.* ("Courts generally view a substantial penalty for competing as a restriction on the right of the withdrawing partner to practice, even though the agreement does not explicitly bar the withdrawing lawyer from competing with the former firm"). The "broad prophylactic object" of rule 5.6, *id.* at 257, requires close judicial scrutiny of any partnership provision that imposes financial disincentives on attorneys who leave a firm and then compete with it. We turn now to a review of the contractual provisions at issue.

b. *Partnership agreement.* Here, paragraphs 5A and 5B of the agreement are unenforceable because they erect obvious economic disincentives to competition that cannot reasonably be justified by any legitimate interest DBRC had in its own

[14]We recognize a limited exception to the general policy in favor of client choice where the actions of a former partner would jeopardize a firm's legitimate interest in survival, thus shrinking the available market of attorneys. See *Pettingell, supra* at 258. Thus, we have declined to adopt "a per se rule against forfeiture provisions." *Id.* at 255. We also reasoned, however, that a contractual limitation on a former partner's right to practice law after withdrawing from the partnership "would be more difficult to justify if it applied to a withdrawing partner who competes but not to all withdrawing partners." *Id.* at 258.

survival. See note 14, *supra*. Under these paragraphs, the economic disincentives imposed on withdrawing counsel and the attorneys with whom they subsequently affiliate are manifold. Both provisions exact a higher percentage of non-credited client billings from withdrawing partners than from remaining partners for the same work for the same clients. Both provisions reach all fees a withdrawing partner's new firm receives from DBRC clients, even if the new firm had a prior relationship with the client. Finally, the disputed provisions apply to fees for work performed by any partner or associate of the new firm, and regardless whether the client's choice of the new firm had any relation to the actions of the withdrawing partner.[15]

In light of the fact that DBRC's practice concentrated solely on intellectual property matters and that their clients necessarily had to look elsewhere to meet other legal needs, paragraphs 5A and 5B are especially punitive and anticompetitive. Enforcing paragraphs 5A and 5B would provide a windfall to DBRC by channeling fees to the firm for work it would not have, and could not have, undertaken. More importantly, if enforced, these provisions would provide clear disincentives for former DBRC partners to provide legal services to current or former DBRC clients, even where those clients have determined that their own interests would best be served by such representation. A withdrawing partner who retains only 85% or 89.5% of the billings from Client A, because of the need to share fees with DBRC or one of its retired partners, versus 100% of the billings from Client B, likely would pursue Client B more aggressively than Client A, all else being equal, and notwithstanding Client A's preferences. In some circumstances the new firm with which a withdrawing partner becomes associated may not permit representation of a client if the firm is to retain only 85% or 89.5% of the billings, notwithstanding the client's preferences. Moreover, paragraph 5A discourages a departing partner from accepting the former clients of a retired partner, who by definition is no longer available to represent them, even though the clients are in need of new counsel.

---

[15]These consequences flow from a literal reading of paragraphs 5A and 5B, which DBRC sought to enforce.

While we agree with DBRC that paragraphs 5A and 5B of the agreement differ from the provisions we rejected in *Meehan* and *Pettingell*,[16] the artificial limitations that these provisions place on the market of available attorneys are as evident here as in the earlier cases. If enforced, the disputed provisions "would tend to discourage a lawyer who leaves [DBRC] from competing with it. This in turn would tend to restrict a client or potential client's choice of counsel." *Id.* at 257.[17] Because the "law should provide the fullest possible freedom of choice to clients," *id.*, we conclude that paragraphs 5A and 5B violate rule 5.6 and are unenforceable against Eisenstein and Resnick.[18,19]

c. *Other claims.* DBRC claims that, even if paragraphs 5A and 5B are unenforceable, issues of material fact remain that preclude the grant of summary judgment on their claims against Eisenstein and Resnick for breach of the covenant of good faith and fair dealing, estoppel and unjust enrichment, and against Nixon Peabody for intentional interference with advantageous

---

[16]Neither paragraph 5A nor paragraph 5B prohibits a partner from removing "any clients who freely choose to retain him or her as their legal counsel." *Meehan, supra* at 431. Nor do the provisions result in the forfeiture of "all of the benefits that [the partner] would have received if he had voluntarily withdrawn but not competed with the firm." *Pettingell, supra* at 254.

[17]In light of the provisions, there was no reason for DBRC to compete aggressively to keep clients. George W. Neuner, who was DBRC's "informal managing partner" at the relevant time, admitted in his deposition testimony that DBRC did not attempt to retain the clients who brought business to Eisenstein and Resnick following their departure, because of the firm's belief that paragraphs 5A and 5B were enforceable.

[18]Because the provisions violate rule 5.6, we need not determine whether they also violate Mass. R. Prof. C. 1.5 as amended, 432 Mass. 1301 (2000). The DBRC provisions call for the "division of a fee between lawyers who are not in the same firm" without prior "client consent[]," an arrangement Mass. R. Prof. C. 1.5 (e), 426 Mass. 1317 (1998), is designed to limit.

[19]We reject DBRC's argument that paragraph 5A is permissible as "an agreement concerning benefits upon retirement." Mass. R. Prof. C. 5.6 (a). The rule's exception allows an agreement restricting the right of a retiring attorney to practice in exchange for that attorney's receipt of retirement benefits. The exception does not permit an agreement that provides benefits to a retired attorney that also restricts the right of an attorney who has not retired to practice, which is what paragraph 5A does.

Moreover, because paragraph 5A is unenforceable against Eisenstein and Resnick, it is immaterial whether Sewell P. Bronstein, P.C., qualifies as a retired partner for purposes of that paragraph, a status the parties dispute.

business relations. We disagree. DBRC cannot maintain any claims based on breach of paragraphs 5A and 5B, which we have concluded are unenforceable as against public policy. Accordingly, any claims by either Sewell P. Bronstein, P.C., or the other DBRC entities that assert that they "relied" on either the terms of the void provisions, or on representations by Eisenstein and Resnick that they would abide by the provisions, must fail. See, e.g., *T.F.* v. *B.L.*, 442 Mass. 522, 530 n.8 (2004) (contract void as against public policy not enforceable on alternative theory of "promissory estoppel").

DBRC's claims alleging breaches of fiduciary duty and conspiracy for "unfairly acquiring consent from clients to remove cases," are similarly unavailing. Partners in a law firm "owe each other a fiduciary duty of 'the utmost good faith and loyalty,' " and are "obliged to consider their copartners' welfare, and not merely their own." *Meehan, supra* at 433, 434, quoting *Cardullo* v. *Landau*, 329 Mass. 5, 8 (1952). Here, DBRC alleges that Eisenstein and Resnick breached their fiduciary duties by wrongfully disclosing portions of the partnership agreement and DBRC's client information, including client names, fees received, and descriptions of services performed, to Nixon Peabody, which in turn encouraged wrongful actions by Eisenstein and Resnick. However, nothing in the partnership agreement itself, which was drafted by experienced intellectual property attorneys, specifies that the agreement or any information generated by the firm concerning its clients is to be kept confidential.[20] Nor does DBRC point to any other evidence to support its assertion that the disclosed information was confidential to DBRC.

This is not a case where Eisenstein and Resnick launched a "preemptive" campaign to remove their former firm's clients or unfairly withheld client information from the former firm. Cf.

[20]DBRC has not claimed that Eisenstein and Resnick breached their professional duty *to the clients* to keep information relating to their representation confidential. See Mass. R. Prof. C. 1.6 (a) and comment [5], 426 Mass. 1322 (1998). The record does not reflect whether Eisenstein and Resnick obtained the permission of any clients to disclose their identity, amounts billed to the clients over successive years, or a description of the work performed. We emphasize that attorneys must proceed with extreme caution when divulging confidential client information to third parties.

*Meehan, supra* at 436-438.[21] To the contrary, the record indicates that any barriers DBRC encountered in moving aggressively to retain departing clients were largely self-imposed. For example, one remaining partner testified at his deposition that the firm failed to pursue defecting clients because its members did not want "to ruin [Eisenstein and Resnick and clients'] relationship." Another testified that he did not pursue certain clients that continued to give work to Eisenstein and Resnick because his "tank was already filled up to overflowing."

The claims for breach of fiduciary duty also falter on the requirement of harm.[22] On this record, DBRC has no reasonable expectation of proving that it suffered any losses caused by either the disclosure of confidential information by Eisenstein and Resnick, or the failure of Eisenstein and Resnick to convey to each of their partners their belief, formed two years before their departure, that paragraphs 5A and 5B were unenforceable. See *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991) (summary judgment appropriate where nonmoving parties have "no reasonable expectation of proving an essential element" of their claims). Rather, the evidence shows that any harm claimed by DBRC was caused by its own misplaced reliance on the enforceability of the provisions and its indifferent approach to client retention. Nor does DBRC dispute the judge's findings that its distributions to partners increased substantially in the two years after Eisenstein and Resnick left the firm. Because DBRC's claims against Eisenstein and Resnick cannot be maintained, neither can their corollary claims against Nixon Peabody.

---

[21]At his deposition, Resnick testified and DBRC has not disputed that, in contacting clients of DBRC after giving his notice of withdrawal, he followed the method recommended by the American Bar Association (ABA), which DBRC approved. See *Meehan, supra* at 437 & n.15 (describing ABA's "ethical standards for attorneys announcing a change in professional association," which "is intended primarily to protect clients").

[22]DBRC appears to calculate its claimed harm by applying the fee-sharing provisions of paragraphs 5A and 5B to the new business Eisenstein and Resnick have done for past and present clients of DBRC. The correct measure of loss on the breach of fiduciary duty claims, however, is the profit DBRC would have made from former clients whose business it would have retained but for the alleged breaches by Eisenstein and Resnick. See *Meehan, supra* at 441-447.

3. *Conclusion.* For the reasons stated above, we affirm the grant of summary judgments in favor of Eisenstein, Resnick, and Nixon Peabody.

*So ordered.*