JOEL F. PIERCE & others[1] *vs.* MORRISON MAHONEY LLP
(and two companion cases[2]).

Suffolk. October 8, 2008. - December 9, 2008.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, CORDY, & BOTSFORD, JJ.[3]

*Partnership,* Attorneys, Withdrawal of partner. *Supreme Judicial Court,* Practice
of law. *Collateral Estoppel. Words,* "Voluntarily withdrawn," "Retired."

A law firm's partnership agreement, which imposed financial consequences on
all partners who voluntarily withdrew from the firm before reaching a
certain age or serving as partners for a specific period of time, regardless
of whether they competed with the firm after withdrawing, did not violate
Mass. R. Prof. C. 5.6, in that there was nothing in the creation of such a
financial disincentive for partners to leave the firm that inherently conflicted
with the public policy disfavoring restrictions on a client or potential
client's choice of counsel. [724-729]
In a civil action brought by former partners of a law firm, challenging the law
firm's partnership agreement, which imposed financial consequences on all
partners who voluntarily withdrew from the firm before reaching a certain
age or serving as partners for a specific period of time, regardless of
whether they competed with the firm after withdrawing, a prior arbitration
involving the law firm and a former partner did not bind the firm under
principles of traditional collateral estoppel, where the plaintiffs in this case
were nominal codefendants in the prior arbitration, and thus were not the
law firm's adversaries [729-730]; moreover, the judge did not abuse his
discretion in declining to give offensive collateral estoppel effect, where
the issue in the case was essentially legal and treating it as conclusively
determined in the arbitration would inappropriately foreclose opportunity
for obtaining reconsideration of the legal rule upon which the issue was
based [730-732].

CIVIL ACTIONS commenced in the Superior Court Department
on August 13, 2004, October 4, 2004, and February 6, 2006,
respectively.

Motions for summary judgment were heard by *Charles R.*

[1]John J. Davis and Elizabeth M. Fahey.

[2]Mitchell S. King *vs.* Morrison Mahoney LLP and Alice Olsen Mann *vs.*
Morrison Mahoney LLP.

[3]Justice Greaney participated in the deliberation on this case prior to his
retirement.

*Johnson*, J., sitting under statutory authority, and following consolidation, the cases were considered by him on a statement of agreed facts.

The Supreme Judicial Court granted an application for direct appellate review.

*Timothy J. Dacey* (*Derek B. Domian & Robert A. Curley, Jr.,* with him) for Morrison Mahoney LLP.

*Anthony M. Doniger* (*Andrew R. Levin* with him) for Joel F. Pierce & others.

*William A. Worth,* for Mitchell S. King, was present but did not argue.

*Alice Olsen Mann,* pro se, submitted a brief.

CORDY, J. In *Pettingell* v. *Morrison, Mahoney & Miller,* 426 Mass. 253, 256 (1997) (*Pettingell*), we precluded the enforcement of a provision in the Morrison, Mahoney & Miller partnership agreement that "impose[d] adverse consequences on a withdrawing partner" who competed with the law firm. We precluded enforcement because the provision did not impose such adverse consequences on a withdrawing partner who did not compete with the firm. We concluded that the provision violated the public policy of protecting the rights of clients and potential clients to their choice of counsel, as embodied in S.J.C. Rule 3:07, Canon 2, DR 2-108 (A), 382 Mass. 773 (1981), now Mass. R. Prof. C. 5.6, 426 Mass. 1411 (1998) (rule 5.6).[4] In this case, we must decide whether that firm's amended partnership agreement, which imposes identical financial consequences on all partners who voluntarily withdraw from the firm, regardless of whether they compete with the firm after withdrawing, also violates rule 5.6. We conclude that it does not. We also conclude that the plaintiffs' claim that Morrison Mahoney was collaterally estopped from contesting liability in this case was properly rejected.

*Background.* The following facts are taken from the parties' stipulations,[5] which we have supplemented with additional undisputed facts from the record.

---

[4]The two rules are essentially the same.

[5]The parties submitted stipulated facts to the Superior Court judge in four parts: "I. Stipulated Facts that All Parties Consider Relevant; II. Stipulated Facts that Plaintiffs Consider Relevant but Morrison Mahoney Does Not;

The defendant Morrison Mahoney LLP (Morrison Mahoney or the firm)[6] is a limited liability partnership engaged in the practice of law. The plaintiffs Joel F. Pierce, John J. Davis, Elizabeth M. Fahey, Mitchell S. King, and Alice Olsen Mann are lawyers admitted to the practice of law in Massachusetts who became partners of Morrison Mahoney (or its predecessor) in 1981, 1987, 1987, 1987, and 1985 respectively. On January 17, 1989, Morrison Mahoney adopted a new partnership agreement, which each plaintiff signed. The partnership agreement provided that any provision of the agreement could be amended by vote of the partners.

Under the 1989 partnership agreement Morrison Mahoney maintained its financial accounts and reported its income to the Internal Revenue Service on a cash basis. Morrison Mahoney also maintained its financial accounts on an accrual basis. Income reported on an accrual basis included some components that were not included in Morrison Mahoney's cash basis income for the same year, such as work that had not yet been billed and the estimated potential amount collectible on subrogation cases and contingent fee cases. Income reported on a cash basis included some components that were not included in Morrison Mahoney's accrual basis income for the same year, such as fees that were received for billings in a prior year and fees collected on subrogation and contingent fee cases.

Under the 1989 partnership agreement, Morrison Mahoney partners received annual drawing accounts, paid out in equal instalments during the year. From time to time, partners received additional distributions from the firm. The 1989 partnership agreement also allocated the increase or decrease in the net worth of the partnership resulting from each year's operation (i.e., net income or loss), determined on an accrual basis, among the partners. The increase or decrease in the firm's net worth was divided into portions and allocated to each partner as annual partnership interest credits (APICs). The amount of APICs

III. Stipulated Facts that Morrison Mahoney Considers Relevant but Plaintiffs Do Not; IV. Stipulated Facts as to John Davis's Claims." The parties also submitted stipulated-to exhibits to the Superior Court.

[6]Morrison Mahoney LLP (Morrison Mahoney) is the successor to Morrison, Mahoney & Miller.

allocated to each partner was noted on the accrual reports prepared by Morrison Mahoney's accountants and on yearly records kept for each partner.

The 1989 partnership agreement described several ways in which partners could receive payments on account of their APICs. With respect to active partners, the agreement provided that "[a]t the end of each fiscal year, an amount equal to 50 percent of the cash surplus, if any, shall be paid as extra compensation to the partners who have positive [APICs] standing in their name from previous years." This practice was known in the firm as the "50/50 Rule." Payments to active partners on account of APICs from the firm's cash surplus were made on a "First In, First Out" basis. That is, the oldest APICs allocations were paid first, such that partners with more seniority were paid before partners with less seniority. The amount distributed to such partners on account of their APICs was attributable to them as earned income for income tax purposes for that year and was reflected in Morrison Mahoney's financial statements. Partners departing from Morrison Mahoney could also receive APICs payments after their departure in certain circumstances. For example, departing partners who retired under the terms of the agreement after having been a Morrison Mahoney partner for twenty years or attaining the age of sixty could receive payment on account of their APICs after departing the firm.[7] However, if such a partner subsequently resumed the practice of

---

[7]The partnership agreement defined "retirement" as "the complete withdrawal of a partner from the active practice of law. Writing, teaching or lecturing for compensation in the field of law, and/or the serving as in-house counsel for an entity other than a law firm or other organization in competition with the firm, may be carried on by a retired partner. A retired partner may act as a consultant on legal matters for compensation; but in such event, the compensation shall be billed by the firm on a basis to be mutually agreed upon. The firm may also compensate a retired partner for special work performed for the firm or for significant matters brought by him to the firm during the period of his retirement. Nothing herein contained shall limit a retired partner from engaging in business activities other than the practice of law, provided that such activities are not in competition with activities carried on by the partnership." The agreement permitted a partner to retire at any time, but also provided that "[i]n the event a partner shall retire after having been a partner for twenty (20) years or attaining age sixty (60), whichever shall come first," that partner shall be entitled to certain benefits, including APICs payments. These provisions remained in place after the partnership agreement was amended in 1995.

law "other than [at] the . . . firm," the agreement treated that partner as a voluntarily withdrawn partner.[8] Departing partners who voluntarily withdrew from the firm would receive APICs payments only if they did not compete with the firm.[9]

This forfeiture-for-competition provision for voluntarily withdrawing partners became the subject of litigation. In 1993, two Morrison Mahoney partners, Richard Pettingell and Joseph Regan, voluntarily withdrew from the firm and established a competing law practice. Morrison Mahoney refused to make APICs payments to them on the grounds that the voluntarily withdrawn partners had forfeited their right to receive APICs payments under the 1989 partnership agreement. A lawsuit followed. In May, 1996, a Superior Court judge granted summary judgment to Pettingell and Regan, and on December 10, 1997, this court also ruled in their favor, concluding that the forfeiture-for-competition provision violated the polices underlying DR 2-108 (A). *Pettingell, supra* at 255.

While the *Pettingell* litigation was pending, the partners of Morrison Mahoney voted to amend the 1989 partnership agreement (1995 amendments). The 1995 amendments froze the APICs accounts, so that there was no further accrual for any year after 1994.[10] They also deleted the "50/50 Rule." Most importantly to this case, the 1995 amendments deleted the forfeiture-for-competition provision for voluntarily withdrawing partners and

---

[8]The partnership agreement provided, in pertinent part: "If a partner who retires returns to practice other than to the continuing firm, his status shall change and he shall, back to the date of retirement, be treated as a partner who has voluntarily withdrawn . . . and all payments to him hereunder shall be on the basis of a partner who has voluntarily withdrawn, and he shall account for all excess payments theretofore received by him." This provision remained in place after the partnership agreement was amended in 1995.

[9]The 1989 agreement provided, in pertinent part: "In the event of such voluntary withdrawal, except as provided . . . below, a partner shall be entitled to [certain] benefits," which included APICs. The next paragraph of the agreement provided: "In the event of such voluntary withdrawal under circumstances where the withdrawing partner engages in any activities which are in competition with the then current activities of the firm, he shall forfeit all of the benefits and rights" to which he would otherwise be entitled, which included APICs. These provisions were deleted in 1995 and replaced with the provision set forth at note 11, *infra*.

[10]As of December 31, 1994, the unpaid balance in the firm's partners' APICs accounts was $21,179,856.

replaced it with a provision that provided that all partners voluntarily withdrawing from the firm would forfeit their APICs, regardless of whether the partners competed with Morrison Mahoney after withdrawal.[11] Pierce, Davis, King, and Mann attended the meeting at which the 1995 amendments were adopted and all of them voted for the amendments. Fahey did not attend the meeting or vote for the amendments by proxy.

The plaintiffs Pierce, Davis, and Fahey voluntarily withdrew from Morrison Mahoney effective September 18, 1998, to form a new law firm. Mann voluntarily withdrew from Morrison Mahoney effective October 5, 1998, to form her own law office. King voluntarily withdrew from Morrison Mahoney effective February 18, 2000, to join another law firm. None of the plaintiffs had reached age sixty or served as a Morrison Mahoney partner for twenty years, and each planned to continue practicing law.[12] Relying on the 1995 amendments, Morrison Mahoney made no payments on account of APICs to any of the plaintiffs.

In August, 2004, Pierce, Fahey, and Davis sued Morrison Mahoney in the Superior Court. Mann and King brought separate actions in the Superior Court against Morrison Mahoney in October, 2004, and February, 2006, respectively. All five plaintiffs sought APICs payments from Morrison Mahoney. On cross motions for summary judgment, a judge ruled that Morrison Mahoney was not collaterally estopped from contesting liability by reason of an adverse ruling against it in a prior arbitration. All three cases were consolidated at the request of the parties for a trial on stipulated facts and exhibits. The judge concluded that to the extent the 1995 amendments did not permit voluntarily withdrawn partners who continued to practice law to receive

[11]The 1995 amendments deleted the provisions set forth at note 9, *supra*, and inserted the following language: "[A] partner who voluntarily withdraws from the partnership shall be entitled only to his cash basis capital account (and shall be responsible for repayment of cash basis capital account overdraws and any and all other debts he may owe to the partnership) and shall have no further rights or interest in or to any assets of the partnership or to Annual Partnership Interest Credits, if any, that may appear on any of the books and records of the partnership or to any share of, or participation in, or payments out of profits of, the partnership after the date of withdrawal."

[12]At the time of their respective withdrawals, the balances in the plaintiffs' APICs accounts were as follows: $1,076,855 for Pierce; $225,235 for Davis; $70,585 for Fahey; $94,876 for King; $177,999 for Mann.

APICs payments, the amendments violated rule 5.6, and ordered Morrison Mahoney to make APICs payments to the plaintiffs. Morrison Mahoney appealed from the judgment and the plaintiffs cross-appealed. We granted Morrison Mahoney's application for direct appellate review.

*Discussion. Rule 5.6.* "Because the case was submitted on the basis of a fully stipulated record, we consider the legal issues presented on appeal de novo." *Hochberg* v. *Proctor*, 441 Mass. 403, 409 (2004), and cases cited.

Rule 5.6 provides in pertinent part: "A lawyer shall not participate in offering or making . . . a partnership or employment agreement that restricts the right of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement . . . ." Our cases make clear that rule 5.6 exists primarily to protect the interests of clients, not lawyers. See *Pettingell, supra* at 255-256. See also *Eisenstein* v. *David G. Conlin, P.C.*, 444 Mass. 258, 262-263 (2005) (*Eisenstein*); *Meehan* v. *Shaughnessy*, 404 Mass. 419, 431 (1989); comment 1 to rule 5.6, 426 Mass. 1411 (1998) ("An agreement restricting the right of partners or associates to practice after leaving a firm not only limits their professional autonomy but also limits the freedom of clients to choose a lawyer"); Restatement (Third) of the Law Governing Lawyers § 13 comment b, first par. at 119 (2000) ("The rationale for the rule is to prevent undue restrictions on the ability of present and future clients of the lawyer to make a free choice of counsel").

As noted above, we previously reviewed the enforceability of the forfeiture-for-competition provision in Morrison Mahoney's 1989 partnership agreement, holding that it violated DR 2-108 (A), the predecessor to rule 5.6, and was therefore void as against public policy. *Pettingell, supra* at 255, 258. We reasoned that such a provision would "discourage a lawyer who leaves a firm from competing with it," which "would tend to restrict a client or potential client's choice of counsel." *Id.* at 257.

We reached a similar conclusion in *Eisenstein, supra*. At issue in that case was "whether a law firm may contractually bind former partners to share fees they earn from the firm's cur-

rent and former clients after the partners leave the firm." *Id.* at
259. We held that such provisions are unenforceable because
they "provide clear disincentives for former . . . partners" to
serve the firm's clients, even though "those clients [may] have
determined that their own interests would best be served by
such representation." *Id.* at 264. Thus, such fee-sharing provi-
sions "impinge on the 'strong public interest in allowing clients
to retain counsel of their choice.' " *Id.* at 259, quoting *Meehan*
v. *Shaughnessy, supra* at 431. The *Eisenstein* case made clear
that "[r]ule 5.6 exists to protect the strong interests clients have
in being able to choose freely the counsel they determine will
best represent their interests. The rule furthers the client's right
freely to select counsel by prohibiting attorneys from engaging
in certain practices that effectively shrink the pool of qualified
attorneys from which clients may choose." *Id.* at 262. Accord-
ingly, "[t]he 'broad prophylactic object' of rule 5.6 . . . requires
close judicial scrutiny of any partnership provision that imposes
financial disincentives on attorneys who leave a firm *and then
compete* with it" (emphasis added). *Id.* at 263, quoting *Pettin-
gell, supra* at 257.

Central to our holdings in both *Pettingell* and *Eisenstein* were
the different fates of a lawyer who withdrew and competed and
one who withdrew but did not compete. In each case, the partner-
ship agreement created a strong disincentive for withdrawing
partners to represent clients who formerly had been represented
by the prior firm, or whose representation might be viewed as
competitive to the firm. The problem in *Pettingell* was not that
a forfeiture occurred, but that after voluntarily withdrawing
from Morrison Mahoney, a partner who wanted to compete had
to choose between (1) representing Client A and forfeiting his
APICs account or (2) declining to represent Client A and retain-
ing his APICs. The problem in *Eisenstein* was similar in that
after leaving the firm, the former partner had to choose between
(1) representing the former firm's clients and remitting a por-
tion of the fees from those clients to that firm or (2) declining
to represent the former firm's clients in order to keep one hundred
per cent of the fees generated from other clients. The financial
disincentives in those cases tended to limit a client's choice of
counsel by discouraging former firm lawyers from representing

certain clients. In this case, however, the fate of a lawyer who voluntarily withdraws and competes with Morrison Mahoney for its clients is precisely the same as the fate of a lawyer who voluntarily withdraws and does not: both forfeit their APICs on withdrawal. Thus, a Morrison Mahoney partner who voluntarily withdraws and competes is no longer faced with the choice that was problematic in *Pettingell*. Instead, that lawyer may accept the representation of any client without triggering a financial forfeiture. This does nothing to "shrink the pool of qualified attorneys from which clients may choose." *Eisenstein, supra* at 262.

Nevertheless, the plaintiffs argue that this constituted a "de facto forfeiture-for-competition provision" because no partner could voluntarily withdraw from Morrison Mahoney, compete with the firm, and receive APICs payments. However, the plaintiffs fail to acknowledge the difference between a loss of benefits that is triggered by the decision to compete and one that is triggered by the decision to leave, whether or not one later competes. Only the first limits client choice in violation of the public policy behind rule 5.6. The purpose of rule 5.6 is not to protect lawyer mobility. A provision that makes a lawyer reluctant to leave, but that does not restrict the lawyer's conduct after he or she departs, does nothing to prevent the lawyer from thereafter accepting clients in competition with the firm. In restructuring its partnership agreement in this fashion, Morrison Mahoney has created a financial disincentive for its partners to leave the firm before they reach age sixty or serve as partners for twenty years. There is nothing inherently violative of public policy in partners agreeing to such disincentives in the interests of the long-term financial and professional health of their enterprises.

The plaintiffs argue further that the partnership agreement's definition of "retirement" allows the firm to discriminate between partners who leave to compete and those who do not by classifying competing partners as "voluntarily withdrawn" (and thus not entitled to APICs) and classifying noncompeting partners as "retired." Notably, not all "retired" partners are entitled to APICs payments. As we have already explained, of the partners who meet the agreement's definition of retirement, only those

who do so *after* reaching age sixty or serving as a partner for twenty years receive APICs payments upon their departure. See note 7, *supra.* Regardless of whether Morrison Mahoney classifies a departing partner as "voluntarily withdrawn" or "retired," that partner is not eligible to receive APICs payments before reaching either the age or seniority benchmark.[13]

The plaintiffs direct us to Morrison Mahoney's alleged "disparate treatment" of two partners who left the firm after reaching the age or seniority benchmarks for APICs payments. Although both of these partners met the definition of retirement on departing Morrison Mahoney, one later began to compete and had to forfeit APICs payments, while the other joined the Attorney General's office and continued to receive APICs payments. The plaintiffs point to this as evidence that Morrison Mahoney "had a singular goal of denying partners who competed with the Firm repayment of their APIC[s] accounts." Morrison Mahoney responds by characterizing APICs as "retirement benefits" that fit within the retirement benefits exception in rule 5.6. See Mass. R. Prof. C. 5.6 ("A lawyer shall not participate in offering or making . . . a partnership or employment agreement that restricts the right of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement . . ."). The plaintiffs dispute Morrison Mahoney's characterization of APICs as "retirement benefits" and argue that APICs in fact represent each partner's ownership interest in the firm, which was "fixed and vested at the time allocated and reflected a return of income that had been earned and deferred."

---

[13]The plaintiffs point to a provision in the partnership agreement entitled "Forfeiture of Certain Payments" (section X.N.) as evidence that "the intent of the Firm always has been to prevent attorneys from competing with it after departure." That provision states: "In the event a partner shall terminate as a partner for any reason and shall within the five years following his termination, or such longer period *during which he shall be entitled to payments from the firm hereunder,* engage in activities which are competitive to those of the firm, he shall forfeit all remaining payments due him hereunder and shall thereupon return to the firm the amount of any payments which may have been made to him by the firm pursuant to this Agreement following his termination as a partner" (emphasis added). However, this provision does not apply to partners in the plaintiffs' position, who are not "entitled to [APICs] payments from the firm" after departing. Morrison Mahoney does not rely on this provision as providing the basis for its denial of APICs payments to the plaintiffs.

We need not decide, however, whether APICs are a "retirement benefit" or some other form of interest or expectancy. The answer to that question is only relevant to the class of partners whose receipt of APICs may be contingent on whether they compete, that is, partners who have reached age sixty or served as a Morrison Mahoney partner for twenty years. No plaintiff in this case had reached those benchmarks on departing from Morrison Mahoney. Whether Morrison Mahoney's amended partnership agreement shrinks the pool of attorneys who have reached the age or seniority benchmark in derogation of client choice is thus not before us.

Finally, the plaintiffs cite *Weiss* v. *Carpenter, Bennett & Morrissey*, 143 N.J. 420 (1996), for the proposition that a provision in a partnership agreement can violate rule 5.6 even though it treats all departing partners equally. In *Weiss*, the Supreme Court of New Jersey affirmed an arbitration award in favor of a departing partner who claimed that a provision of the partnership agreement that prohibited a withdrawing attorney from receiving a distribution of his capital account if he was withdrawing "for any reason other than death, permanent disability, attainment of age sixty-five, or appointment to the judiciary" violated the New Jersey version of rule 5.6. *Id.* at 422, 448. Morrison Mahoney, on the other hand, cites a similar case decided by the New York Court of Appeals, *Hackett* v. *Milbank, Tweed, Hadley & McCloy*, 86 N.Y.2d 146, 150-151 (1995), which reinstated an arbitration award in favor of a law firm whose partnership agreement had provided for limiting supplemental payments for all withdrawing partners based on the level of their income at their new employment.[14] This provision applied to all withdrawing partners regardless of the nature of their subsequent occupation or practice. *Id.* The award had been set aside on public policy grounds by a lower court. *Id.* at 149. The Court of Appeals disagreed, noting that the reduction "applies to all withdrawing partners and no financial disincentive specifically devolves on partners withdrawing to compete with [the firm] in contrast to all other withdrawing partners." *Id.* at 156.

---

[14]The amount available to make supplemental payments was based on the firm's profits calculated over three years. *Hackett* v. *Milbank, Tweed, Hadley & McCloy*, 86 N.Y.2d 146, 150 (1995).

Insofar as both cases turn on their respective State's strong public policy in favor of enforcing arbitration awards, they are of limited utility.

In sum, we are persuaded that, in the circumstances of this case, the provisions of Morrison Mahoney's amended partnership agreement resulting in the plaintiffs' forfeiture of APICs did not violate the policy embodied in rule 5.6 as we have interpreted it in *Pettingell* and *Eisenstein*.

*Collateral estoppel.* As an alternative basis for judgment in their favor, the plaintiffs argue that Morrison Mahoney is bound under principles of collateral estoppel by a prior arbitration involving the firm and a former partner, Alan G. Miller. Miller retired from Morrison Mahoney in October, 1997, after more than thirty years as a partner, and began receiving APICs payments. Thereafter, Miller resumed the active practice of law, and Morrison Mahoney stopped making APICs payments to Miller. Miller sued Morrison Mahoney, seeking to recover his APICs account, among other things, and the parties arbitrated the dispute. The arbitrator concluded that under the terms of the partnership agreement Miller had become a voluntarily withdrawn partner when he resumed the practice of law and to the extent that the 1995 amendments deprived such a lawyer of his accrued APICs, the amendments were invalid under our holding in *Pettingell*. The plaintiffs in this case, four of whom were named codefendants in the Miller arbitration by reason of their status as partners of Morrison Mahoney at the time, now seek to bind Morrison Mahoney to the arbitrator's conclusion. The plaintiffs assert that whether analyzed under traditional collateral estoppel principles or offensive collateral estoppel principles, Morrison Mahoney is bound by the Miller arbitration. We disagree.

Traditional collateral estoppel is inapplicable here because the plaintiffs and Morrison Mahoney were not adversaries in the Miller arbitration. "[T]he doctrine of issue preclusion, or collateral estoppel as it is also known[,] . . . provides that '[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action *between the parties*, whether on the same or a different

claim' " (emphasis added). *Fireside Motors, Inc.* v. *Nissan Motor Corp. in U.S.A.*, 395 Mass. 366, 372 (1985) (*Fireside*), quoting Restatement (Second) of Judgments § 27 (1982). "Not only must the subsequent litigation occur between the same parties to the prior action, but also the parties must have been adversaries with respect to the issue previously litigated." *Fireside, supra.* See Restatement (Second) of Judgments, *supra* at § 27 comment a. Although four of the plaintiffs in this case were parties to the Miller arbitration, they were Morrison Mahoney's nominal codefendants in the arbitration, and thus were not Morrison Mahoney's adversaries. "Because the current plaintiff[s] and [Morrison Mahoney] were both defendants in the original suit, rather than adversaries, the judgment for [Miller] is not conclusive as to the rights and liabilities of the codefendants to each other." *Fireside, supra* at 374.

 " '[T]he offensive use of collateral estoppel is a generally accepted practice in American courts,' . . . and occurs when a plaintiff seeks to prevent a defendant from litigating issues which the defendant has previously litigated unsuccessfully in an action against another party." *Bar Counsel* v. *Board of Bar Overseers*, 420 Mass. 6, 9 (1995), quoting *Aetna Cas. & Sur. Co.* v. *Niziolek*, 395 Mass. 737, 744 (1985). Thus offensive collateral estoppel "does not require mutuality of parties, so long as there is an identity of issues, a finding adverse to the party against whom it is being asserted, and a judgment by a court or tribunal of competent jurisdiction." *Miles* v. *Aetna Cas. & Sur. Co.*, 412 Mass. 424, 427 (1992) (*Miles*). "The central inquiry then becomes whether the issue on which preclusion is sought has been 'the product of full litigation and careful decision.' " *Id.*, quoting *Home Owners Fed. Sav. & Loan Ass'n* v. *Northwestern Fire & Marine Ins. Co.*, 354 Mass. 448, 455 (1968). "A defendant must also have [had] a 'full and fair opportunity to litigate the issue in the first action.' " *Matter of Goldstone*, 445 Mass. 551, 559 (2005), quoting *Matter of Cohen*, 435 Mass. 7, 15 (2001). See Restatement (Second) of Judgments § 29 (1982) (listing eight circumstances for judge to consider when determining propriety of applying offensive collateral estoppel). Ultimately, "[f]airness is the 'decisive consideration' in determining whether to apply offensive issue preclusion." *Matter of*

*Goldstone, supra,* quoting *Matter of Cohen, supra* at 16. Accordingly, we afford the trial judge "wide discretion in determining whether" applying offensive collateral estoppel "would be fair to the defendant." *Bar Counsel* v. *Board of Bar Overseers, supra* at 11, citing *Whitehall Co.* v. *Barletta,* 404 Mass. 497, 502 (1989).

We have held that it is appropriate to give issue-preclusive effect to arbitration awards where the "arbitration affords opportunity for presentation of evidence and argument substantially similar in form and scope to judicial proceedings," *Miles, supra* at 427, quoting *Bailey* v. *Metropolitan Prop. & Liab. Ins. Co.,* 24 Mass. App. Ct. 34, 36-37 (1987). Nevertheless, a judge must carefully consider the exceptions and qualifications to the use of the collateral estoppel doctrine before applying it to an arbitration award. See Restatement (Second) of Judgments § 84 comment f (1982) (exceptions and qualifications in §§ 28 and 29 are "particularly pertinent in considering the preclusive effect of an arbitration award").

*Miles* was a case that involved the defensive use of an arbitration award. See *Miles, supra* at 425. Assuming without deciding that we would give issue-preclusive effect to arbitration awards used offensively, we agree with the Superior Court judge that doing so would be inappropriate in the circumstances of this case. As we have explained, a judge enjoys wide latitude in determining whether it is fair to apply offensive collateral estoppel to a defendant in a particular case. In declining to give offensive collateral estoppel effect to the Miller arbitration award, the judge reasoned that the issue in the case was "essentially legal" and that "treating it as conclusively determined would inappropriately foreclose opportunity for obtaining reconsideration of the legal rule upon which it was based." *Bar Counsel* v. *Board of Bar Overseers, supra* at 11-12, quoting Restatement (Second) of Judgments, *supra* at § 29. See Restatement (Second) of Judgments, *supra* at § 29 comment i ("This consideration is especially pertinent when there is a difference in the forums in which the two actions are to be determined, as when the issue was determined in the first action by a trial court and in the second action will probably be taken to an appellate court . . . or when the issue is of general interest and has not been resolved by the highest

appellate court that can resolve it"). Cf. Restatement (Second) of Judgments, *supra* at § 28 comment b ("A rule of law declared in an action between two parties should not be binding on them for all time, especially as to claims arising after the first proceeding has been concluded, when other litigants are free to urge that the rule should be rejected. Such preclusion might unduly delay needed changes in the law and might deprive a litigant of a right that the court was prepared to recognize for other litigants in the same position"). The issue in this case is especially fit for resolution by this court as the ultimate arbiter of the Massachusetts Rules of Professional Conduct, and we decline to disturb the entry of partial summary judgment in Morrison Mahoney's favor on that issue.[15]

*Conclusion.* We reverse the judgments for the plaintiffs on their claims that Morrison Mahoney's partnership agreement violates rule 5.6 by depriving them of their APICs. We affirm entry of partial summary judgment for Morrison Mahoney on the plaintiffs' claims of collateral estoppel. The case is remanded for entry of judgments in favor of Morrison Mahoney.

*So ordered.*

---

[15]Another reason for denying preclusive effect to the Miller arbitration is that Miller, as a retired partner who had served as a Morrison Mahoney partner for over thirty years, was in a markedly different position than the plaintiffs here.